**Terry Dean PHILLIPS and Terry Dean Phillips as Next Friend of Dallas Rae Spurling, Appellants,**

v.

**Cory DAVIS–SPURLING, Appellee.**

No. 94–1690.

Supreme Court of Iowa.

Nov. 22, 1995.

Rehearing Denied Dec. 15, 1995.

Dan T. McGrevey, Fort Dodge, for appellants.

Jerry L. Schnurr III, Fort Dodge, for appellee.

Considered by LARSON, P.J., and CARTER, NEUMAN, ANDREASEN, and TERNUS, JJ.

LARSON, Justice.

This is a contest under Iowa Code section 600B.40 (1993) for the primary physical care of a five-year-old girl, Dallas. The parents, Terry Phillips and Cory Davis–Spurling, have never been married. The district court awarded physical care to the mother, and the court of appeals affirmed. We vacate the court of appeals decision and reverse the judgment of the district court.

Dallas was born in June 1990 following a brief relationship between her parents. Terry did not know that he had a child until Dallas was about six months old. Paternity was later established by a court decree and is not at issue here.

Immediately on learning that Dallas was his child, Terry began to bond with her, and in 1994, he petitioned for her custody under Iowa Code section 600B.40:

> The mother of a child born out of wedlock whose paternity has not been acknowledged and who has not been adopted has sole custody of the child unless the court orders otherwise. If a judgment of paternity is entered, the father may petition for rights of visitation or custody in an equity proceeding separate from any action to establish paternity.

While this section provides for "custody," we construe it consistently with our dissolution statutes to contemplate both custody and primary physical care. *See* Iowa Code § 598.41(5) (1993) (distinguishing custody and joint physical care). In the present case, the district court granted custody jointly to the parties, and neither party challenges that part of the order. At this point, the issue is who should have the primary physical care of Dallas.

■ Iowa Code section 600B.40 expressly provides that its proceedings are to be in equity, so our review is de novo. Iowa R.App.P. 4. Our primary concern, of course, is the best interests of the child. Iowa R.App.P. 14(f)(15). Our objective is to place Dallas in the environment most likely to bring her to healthy physical, mental, and social maturity. *Lambert v. Everist,* 418 N.W.2d 40, 42 (Iowa 1988).

■ Evidence at the trial showed that Cory was unemployed except for occasional baby-sitting for family members. She had held a job for a very short time as a housekeeper in a motel but had quit because her boss was too "bossy." She has had difficulty in maintaining a residence, having moved many times during Dallas's relatively short lifetime. Her home was described in some of the testimony as a disaster. More significant, we believe, is an apparent failure of the child to thrive under her care. When Dallas went to live with her grandmother under a court order prior to trial, she was almost four years old, yet she weighed only twenty pounds. She gained ten pounds in the next seven months. The testimony tended to show an inability on the part of the mother to manage her finances, and both she and her husband required payees for their SSI benefits.

The father, on the other hand, has shown a history of irresponsibility. He has fathered another child outside of marriage, and paternity proceedings regarding that child are pending. He is also several thousand dollars behind in his support payments for Dallas, and he has been convicted of drunk driving, theft of electricity, and driving under suspension. His home was also described as poorly kept.

Despite their shortcomings, it is clear that both parents have a sincere love for this child, and both sincerely desire to obtain primary care of her. Terry is better able to provide for the child's financial needs. He is employed full-time as a diesel mechanic, while Cory is only minimally employed. On the other hand, Cory would be able to spend full-time with Dallas, while Terry would rely on care by his mother when he was at work and Dallas was not in school.

This evidence makes the issue of primary physical care a very close one. However, a consideration not yet mentioned seems to us to tip the balance in favor of the father. That is the apparent inability of the mother

to protect Dallas from abuse by men in the mother's life.

It is undisputed that, when Dallas was fifteen months old, Cory left her in the care of a man by the name of Ronald Knudtson, who engaged in lascivious acts with her. Cory argues that this was an isolated incident, and she could not have prevented it because she did not know that Knudtson was predisposed to these kinds of acts. While this might be so, our greater concern is what will happen if Dallas is required to return to the mother's home in view of the fact that there is substantial evidence that Dallas might be at risk of further sexual abuse at the hands of another man, Cory's husband Harold.

In March 1994, Dallas stayed with Terry and Terry's mother for a week. At the end of that time, Terry's mother reported to Cory that Dallas had been acting in such a manner as to suggest she had been sexually abused by Harold. Cory requested a Department of Human Services (DHS) investigation and agreed to remove Dallas from her home during the ensuing investigation. She took Dallas to Terry's mother who, with Terry, cared for Dallas up to the time of trial in October 1994.

Cory, when asked about her conversations with Dallas about the allegations of Harold's sexual abuse, said: "I asked her a little bit. She said that 'Daddy Harold touched me.' I said 'like where?' She says 'the potty and that.' And I said 'no, Dallas, he won't be, he's not that way.' And I think [she said] all this because she is recollecting what Rodney [Knudtson] did to her."

Cory denied that Harold was capable of abusing Dallas and testified that she thought Dallas was "getting all this" about Harold because of "what Rodney [Knudtson] did to her" in the episode when Dallas was fifteen months old. She also contends that Dallas was merely acting at the suggestion of Terry's family, who were "putting stuff in Dallas's head."

Shirley Phillips, Terry's mother, testified that she noticed that Dallas had been acting strangely. She had nightmares. When she went to bed she cried, kicked, and screamed

"no, no." She "humped" the couch and her dolls. She did the same thing in bed. Because the grandmother was concerned, she told Cory about it. Cory responded that "I'm turning Harold in." Shirley also testified that Dallas said "Daddy Harold's got an icky bone." On further inquiry about whether Harold had choked on a bone, Dallas said "no, grandma, in his pants." Dallas showed what "Daddy Harold done to me" and stated that "he made me sit on his lap, and he put it in my butt."

Cynthia Schumann, a clinical social worker recommended by the DHS, supported Dallas's claims of abuse. Schumann has a bachelor of science degree in family environment and a masters degree in social work. She has received specialized training in situations regarding families, children, and related issues. She testified that she meets with families and individuals to conduct ongoing evaluations.

Schumann first saw Dallas in April 1994. She provided ongoing play therapy for Dallas and performed an evaluation for possible sexual abuse. She testified that play therapy is a method to use with children between the ages of three and twelve because children in that age group are not able to verbalize their thoughts in a counseling session.

Play therapy allows children to act out their thoughts and feelings concerning situations that have occurred in their lives. According to this witness, all of Dallas's acts and statements concerning sexual contact by Harold were spontaneous and not prompted by any questioning. In the first session, Dallas played with dolls, puppets, clay, and drawings. Dallas told the counselor that Harold had touched her "here" and put her hand between her legs and said that Harold did "nasty" things. Dallas also stated that Harold "sometimes puts his icky bone in me" and used an anatomically correct doll to point out the anatomy involved.

When talking about the icky bone, Dallas pulled her skirt down over her knees and held it by her ankles with her legs together. The witness interpreted that as being a protective, nonverbal action. She also noted that Dallas was very preoccupied with the play toilet during play therapy and that stud-

ies have shown that children who have been sexually abused have almost a fetish with toilets and toileting.

When questioned about the possibility that Dallas had been coached or trained to do and say these things, the witness stated:

I don't believe that she was [coached] at all because of the language that she used. She didn't use penis. She didn't use [a] slang word for the word penis. She stated it in words of her own four-year-old developmental [stage], which would be bone or an icky bone.

She didn't really know how to put those, you know. She didn't know the terms that an adult would use, and she was using her own language.

That's one thing that I look for very specifically when I'm trying to determine whether a child has been coaxed or whether or not they are telling me their own story.

The other important issue is also to look at her nonverbal language while she is talking, and her nonverbal language always matched and was congruent with what she was telling me.

She testified that the nonverbal language that Dallas used is something that most people would be unable to train children to do. This witness stated that, based on her education and training, Dallas's claims of sexual abuse could and should be taken seriously. She testified that, while Dallas loves her mother, she does not want to return to her home. Dallas is afraid of Harold, and she is very happy where she is with her father. She testified that to return Dallas to Cory's home with Harold would be a mistake, stating

that children who have been traumatized, who then have to go back to the trauma, usually withdraw and regress developmentally, and are sometimes usually re-traumatized.

Q. So, in other words, what you're saying is that if the child then is placed back into an environment where she has to have significant daily contact with this individual for whom she's expressed fear, it's possible that her development may be either re-

tarded or arrested in some manner? A. Yes.

She stated that recurring nightmares by Dallas involved Harold and reoccurred after she had been visiting in Harold's home. Cory has admitted that Dallas does not like Harold and is afraid of him. Harold did not testify at the trial, so we do not have his side of the story.

Concerning whether a significant change for the better was likely in Cory's home, in terms of potential victimization by Harold, this witness stated that

usually people who have been inappropriate with children in a sexual manner continue to be. It's very difficult for them to change that. There's a lot of research in that area which proves that to be true. If an adult has perpetrated a child, you never trust that adult again alone with a child, never. It's too big a risk.

Regarding Cory's claim that perhaps Dallas's behavior was the result of her earlier sexual abuse by Rodney Knudtson, the witness testified that

I don't think that it is the case. I don't think that Dallas remembers what occurred when she was fourteen or fifteen months old, and she's a very bright little girl.

I don't think that she would now put Harold's name to something that he was not doing and also there have been at least two times in which Cory was unable to protect Dallas or did not protect Dallas from being abused in which I feel she should have as being in the role of the mother.

The district court concluded that the allegations of sexual abuse on the part of Harold could not be given much weight because there was no medical proof of abuse and because the DHS investigation resulted in a conclusion of "undetermined." In DHS terminology, "undetermined" means that the charges are neither founded nor unfounded. Ms. Schumann addressed these matters in her testimony, stating that

the dilemma that the Department of Human Services has when they're doing investigations is that it—really in order to

have a case be founded for sexual abuse, they need to have physical evidence or they need to have the admission by an adult, and fondling doesn't leave physical scars.

The district court also believed that the allegations of sexual abuse, and the statements made by Dallas concerning them, were orchestrated by Terry and his family, based largely on the fact that the child's complaint about sexual abuse came closely on the heels of visits with the grandmother. Yet, curiously, the court ordered Cory to "refrain from leaving the child in the sole care of her husband, Harold Davis, for any extended time."

We believe the best interests of Dallas require that we grant her primary physical care to her father. In reaching that conclusion, we realize that we necessarily place a great deal of weight on the statements and actions of a girl only four years old at the time of trial. Yet, we are persuaded by our review of the entire record that Dallas will be at risk of sexual abuse if placed in Cory's primary care. By Cory's own admissions, Dallas is afraid of Harold for some reason.

We therefore vacate the court of appeals decision and reverse the judgment of the district court. We award primary physical care of Dallas to her father. Because of our concern for the well-being of Dallas during any visitation with her mother, we provide for reasonable visitation but remand for the district court to fashion a protective plan for supervised visitation or another means of protecting her from potential abuse in the mother's home.

Terry has requested an order for child support, but we decline to resolve that issue in this appeal. On remand, the district court shall make an appropriate order concerning child support based on our child support guidelines, keeping in mind, of course, that Terry is in arrears over $8000 in his own court-ordered support payments.

Under Iowa Code section 600B.31, the district court will have continuing jurisdiction over these proceedings, including future decisions regarding child support and "to deter-

mine the custody in accordance with the interests of the child."

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT REVERSED; CASE REMANDED WITH INSTRUCTIONS.**