# IN THE COURT OF APPEALS OF IOWA

No. 15-1282
Filed April 27, 2016

**JARROD DIERS,**
        Petitioner-Appellant,

**vs.**

**ROBERTTA COFFMAN,**
        Respondent-Appellee.
_____


        Appeal from the Iowa District Court for Wapello County, Daniel P. Wilson,

Judge.


        Jarrod Diers appeals from the decree granting physical care of his child to

the child's mother, Robertta Coffman.  **AFFIRMED AS MODIFIED.**


        Judy Johnson of Borseth Law Office, Altoona, for appellant.

        Van T. Everett of Whitfield & Eddy, P.L.C., Des Moines, for appellee.


        Heard by Vogel, P.J., Doyle, J., and Goodhue, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**DOYLE, Judge.**

Jarrod Diers appeals from the decree granting physical care of his child to the child's mother, Robertta Coffman. He contends he should have been granted physical care of the child. In the alternative, he contends he should have received additional visitation. Both parties seek an award of appellate attorney fees. Because we conclude it is in the child's best interests, we affirm the custody provision of the decree granting Robertta physical care and modify the visitation provision of the decree to increase Jarrod's visitation.

**I. Background Facts and Proceedings.**

Jarrod and Robertta began a relationship in October 2011.[1] At the time, Jarrod was enlisted in the Army and stationed in New Mexico, while Robertta lived in Ottumwa. Jarrod and Robertta spent approximately one week together in Ottumwa in December 2011 while Jarrod was on leave for the holidays. Their relationship ended in February 2012.

Not long after her relationship with Jarrod ended, Robertta began a relationship with Torrey Des Combaz. When Robertta discovered she was pregnant in March 2012, she assumed Torrey was the father based on the estimated due date her doctor provided following an ultrasound. Robertta and Torrey lived together, along with Robertta's twelve-year-old child, and treated Torrey as the new child's father.

The child was born in September 2012. Jarrod did not learn of Robertta's pregnancy or the birth until October 2012. The parties give differing accounts of

---

[1] At the time, Robertta was married to Lorentis Culver, though she told Jarrod she was divorced. Robertta and Lorentis had married in 2008 and separated the following year, but they were not divorced until after the birth of the child at issue in these proceedings.

incidents that allegedly occurred from that point in time until the paternity action was initiated:

- Jarrod suspected he was the child's father and claims Robertta told him he was—a claim Robertta refutes.

- Jarrod further claims that in November 2012, he took a self-administered DNA test he bought on the internet, which confirmed he was the child's father. Robertta denies that any DNA testing occurred at that time. There is no documentation of the results of that test in the record.

- Jarrod alleges that Robertta allowed him "visitation" with the child beginning when the child was six months old, with Jarrod allowed to see the child between one and three times per week during the day initially and overnight visitation beginning in July 2013. Robertta denies she gave Jarrod any visitation, testifying instead that she used Jarrod's services as a "backup babysitter."

- Jarrod claims Robertta presented him with a forged copy of the child's birth certificate, which listed the child's last name as Diers and identified Jarrod as the child's father, as well as a forged copy of the child's social security card, which lists the child's last name as Diers. Copies of these documents were admitted into evidence at trial. Robertta denied forging any documents or providing forged documents to Jarrod. She testified that an Ottumwa police officer questioned her about the documents. It does not appear any charges were filed.

- Jarrod alleges Robertta tampered with the labels on the child's prescription medication bottles to hide the fact the child's last name was

not Diers. At trial, Robertta explained that prescription medication stored in a Ziploc bag spilled at her daycare provider's home. While she admitted she handwrote the child's name on the medication, she denied writing the child's last name as Diers and stated the label provided by the pharmacy was also contained in the bag.

- Although the parties agree Jarrod provided Robertta with money before this action was initiated, they provide different explanations as to why and disagree as to the amount. Jarrod claims he gave Robertta $12,500 in child support before the paternity action was initiated, and as proof he introduced into evidence at trial some of the checks he wrote to Robertta. While the checks admitted into evidence total only $5700, Jarrod alleges there were additional checks and cash exchanged. "Child support" is on the memorandum line of only two checks. The memorandum lines on the remaining checks are blank, which Jarrod attributes to Robertta's act of "snatch[ing] these checks out of [his] hand" before he could fill out the line. Robertta refutes Jarrod's claims, testifying instead that Jarrod loaned her money to pay off a medical debt when it threatened to harm her credit score. She testified she did not receive all of the checks that Jarrod introduced at trial. While Robertta could not recall the exact amount Jarrod gave her, she testified it was over $1000. She claims that either the memorandum lines were blank when she received the checks and Jarrod later wrote in "child support" or they were marked as "child support" and she never noticed.

On April 28, 2014, Jarrod served Robertta with a petition to establish paternity, custody, visitation, and support of the child. Robertta disallowed contact between Jarrod and the child beginning the same month because she alleges Jarrod refused to return the child to her unless she agreed to perform a sex act with him. In July 2014, the results of a court-ordered DNA test confirmed Jarrod to be the child's father. Robertta testified she did not allow visitation after receiving the DNA results because she feared that Jarrod would not return the child to her care without a court order in place.

Visitation resumed after a temporary order was entered in October 2014. The order granted Robertta temporary physical care of the child and provided Jarrod with visitation every Wednesday evening and alternating weekends. Jarrod filed a motion to reconsider the temporary custody order, requesting his visitation be increased, and Robertta responded with her own motion asking the court to decrease visitation. The court denied both motions.

In February 2015, Robertta moved in with her boyfriend, Chris. Two months later, Jarrod filed a motion to modify the temporary custody order because Chris was being investigated for sexual abuse of the child. The investigation was initiated after Jarrod reported the alleged sexual abuse to the Ottumwa Police Department and the Iowa Department of Human Services (DHS). The DHS report determined the allegation was not confirmed. The police officer investigating the matter reported to the guardian ad litem (GAL) that he did not "find anything" and was closing the case. The court denied the motion to modify.

This matter was tried in June 2015. At that time, Jarrod was living with his fiancée, Heidi. Robertta continued to live with Chris. Although Robertta and Chris were not engaged at the time of trial, the two had plans to marry.

The GAL provided the trial court with a report containing her recommendations for custody and visitation and testified at trial. The GAL recommended Robertta retain physical care of the child subject to Jarrod's visitation. The GAL recommended visits continue on alternating weekends but with extended hours, beginning on Friday at 5:30 p.m. and ending on Monday at 5:30 p.m. Because weekend visitation would be expanded to end on Monday evening and conflict arose during the exchanges, the GAL recommended the weekly mid-week visitation be discontinued. The GAL also recommended four weeks of summer visitation but added "those four weeks should be separated. That visitation should be no more than two weeks in length. And then separated where [the child] would go back to [Robertta], and then another two weeks."

On June 25, 2015, after hearing from the parties and their witnesses, the district court entered its decree. It found both parents were capable and loving with significant support systems to assist them in raising the child. However, the court noted the child had been in Robertta's care since birth. It further found the child was closely bonded with Robertta's twelve-year-old daughter. The court granted Robertta physical care and ordered Jarrod to pay Robertta $653 per month in child support. Jarrod was granted liberal visitation to be determined by the parties with a default visitation schedule provided in the event the parties could not agree on visitation. The default visitation schedule eliminated the mid-week visits and awarded Jarrod visitation on alternating weekends, beginning at

6:00 p.m. on Friday and ending at 6:00 p.m. on Sunday. Jarrod was also awarded holiday visitation and three non-consecutive weeks of visitation in the summer. The court further ordered the child's surname be changed to Diers.

**II. Scope and Standard of Review.**

We review custody determinations de novo. *McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010). We are not bound by the district court's factual findings, though we give them weight. *Id.* This is especially true with regard to determinations of witness credibility because the district court has the ability to listen to and observe the parties and their witnesses. *Id.*

**III. Physical Care.**

Our overriding consideration in awarding custody is the child's best interests. *Id.* The goal is to place the child in the care of the parent who is best able to minister to the child's long-range best interests. *See In re Marriage of Winter*, 223 N.W.2d 165, 166 (Iowa 1974). In making this determination, we consider the list of factors set forth in Iowa Code section 598.41 (2013), along with other relevant factors. *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007). We seek to place the child in the environment most likely to foster physical and mental health, as well as social maturity. *Phillips v. Davis-Spurling*, 541 N.W.2d 846, 847 (Iowa 1995).

Jarrod argues he is better equipped than Robertta to minister to the child's best interests focusing on three factors we consider in determining physical custody: a parent's alienation of the child from the other parent, a parent's moral

misconduct, and a parent's history as the child's primary caretaker.[2]  We address each of these factors in turn.

### A. Alienation of the child from the other parent.

Jarrod first cites what he considers to be Robertta's attempt to alienate the child from him as a factor that weighs in favor of granting him physical care of the child.  He cites to Robertta's decision to deny him visitation with the child and what he characterizes as Robertta's failure to include him in decision-making with regard to the child as evidence of her attempt at alienation.

Iowa Code section 598.41(1)(c) states: "The court shall consider the denial by one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement."  The undisputed evidence shows Jarrod did not receive visitation with the child from approximately April 2014 through October 2014.  Jarrod claims Robertta's decision to deny him visitation with the child during that time militates against awarding her physical care.

Robertta claims she refused to provide Jarrod visitation because Jarrod refused to return the child at the end of a visit in April 2014 unless she agreed to perform a sex act with him.  At that time, Jarrod's paternity had not yet been established.  After the results of the DNA test revealed Jarrod to be the child's father in July 2014, visitation did not resume.  Robertta testified she was afraid

---

[2] Jarrod argues the trial court did not give enough weight to the first two of these factors while giving too much weight to the third.  Because our review is de novo, we need not address the weight the trial court gave the evidence.  *See In re Lyman*, No. 07-1590, 2008 WL 2042614, at *1 (Iowa Ct. App. May 14, 2008).  Instead, we make our determination anew based on the record before us but make special note of the factors to which Jarrod draws our attention.

that if she allowed Jarrod to take the child for a visit, Jarrod would not return the child to her care. However, the evidence is undisputed that once the temporary order regarding custody and visitation was entered, Robertta abided by it. There is nothing to suggest she will not continue to follow any visitation schedule ordered by the court.

Jarrod cites other incidents as evidence Robertta attempted to alienate the child from him. Specifically, he claims Robertta systematically excluded him from parental decision-making with regard to the child, failed to give him proper notice of doctor's appointments, and failed to provide him with a copy of the child's insurance card. He also claims Robertta's family is unwilling to support his relationship with the child.

The evidence shows the parties' relationship has been contentious since their relationship ended. This is evident in the tone of an email Jarrod sent Robertta in October 2012 after learning she had given birth to a child. Jarrod wrote: "When am I going to get my stuff back? Hows the new baby and whos baby is it? The guy you cheated on me with? All i have to say is wow you work fast lol." By all accounts, the exchanges of the child that accompanied visitation were emotionally-charged. While each party blames the other for the conflict, the evidence shows neither parent is without fault.

We note Jarrod's contribution to the conflict between the parties by making accusations against Robertta and her family. For instance, during the investigation into Chris's alleged sexual abuse of the child, Jarrod and his fiancée, Heidi, expressed concern regarding Robertta's overall care of the child, stating the child arrived at visitations wearing dirty clothes and soiled diapers and

often had cuts and bruises that they felt were not appropriate. Jarrod stated he believed that Robertta and her family were beating the child "to make [the child] not like [him]," and he informed the DHS worker he planned to keep the child at the end of the next visit for this reason rather than returning the child to Robertta's care as set forth in the temporary order. Jarrod and Heidi also expressed their concern the child was being "emotionally abused" in Robertta's care, stating the child "appeared to be in emotional distress" and demonstrated behaviors that were not age appropriate. Although the worker "asked multiple times what emotional distress and [the child] not developing at an age appropriate level meant to Heidi and Jarrod," neither Jarrod nor Heidi elaborated, though they "continued to make these statements with no further information." The DHS worker opined that none of the pictures Jarrod and Heidi had taken of the scratches and bruises they identified on the child at the start of each visit "stood out as patterned injuries or injuries which could be suspect of child abuse." Those who observed the child in both parents' homes, like the DHS worker and the GAL, as well as those who had close contact with the child during the time period in question, like the child's pediatrician and daycare provider, saw no evidence of abuse or suggestion of alienation by either party. Simply put, Jarrod's claims regarding Robertta are not credible.[3]

The evidence shows both parents have at times behaved in a manner contrary to the child's best interests. Each has made accusations against the

---

[3] We also note our concerns about Jarrod's testimony at trial. While Jarrod was able to testify with great specificity on direct examination when questioned by his lawyer, his testimony was much less definite on cross-examination, when Jarrod frequently could not recall specific details about events he had just testified about moments earlier. Jarrod's behavior at trial negatively impacts his credibility.

other while blaming the other for the discord. While Robertta's behavior has not been admirable at all times, it has not been worse than Jarrod's, leaving the parties on even footing with regard to this factor.

**B. Moral misconduct.**

Jarrod next argues Robertta's moral misconduct weights against granting her physical care of the child. He cites her failure to inform him of her pregnancy, as well as his allegation that she intentionally led two men to believe they were the child's father.

We disagree with Jarrod's assessment of the evidence regarding Robertta's behavior before paternity was established. Given the circumstances, it was not unreasonable for Robertta to believe Torrey was the child's father. Robertta had already begun a relationship with Torrey when she learned she was pregnant, and the projected due date provided by her doctor indicated the child would have been conceived after Jarrod returned to New Mexico. Torrey believed he was the father's child and acted as the child's father. He was listed as the child's father on the birth certificate and had the child's name tattooed on his arm. Despite Jarrod's claims he had visitation with the child, including overnight visits beginning in July 2013, Torrey was unaware of any role Jarrod played in the child's life. Torrey did not discover the possibility that someone else might have fathered the child until the paternity action was initiated in April 2014. There is insufficient credible evidence to show Robertta intentionally misled either Jarrod or Torrey regarding paternity.

Even assuming Robertta misled Jarrod regarding the child's paternity, this factor alone is not decisive of the matter of custody. *See In re Marriage of*

*Hornung*, 480 N.W.2d 91, 93-94 (Iowa Ct. App. 1991) (noting that while a parent's "moral misconduct" is a consideration in making custody determinations, it is only one factor to be considered). Our governing consideration must be the child's best interests. *See In re Marriage of Ballinger*, 222 N.W.2d 738, 740 (Iowa 1974). Custody determinations are not made to reward one parent or to punish the other. *See id.* Instead, we must determine which parent can most effectively provide for the child's long-range best interests. *See id.* The trial court found the child "is healthy, happy, and thriving in Robertta's care." As such, the court determined granting Robertta physical care was in the child's best interests, and we agree. *See In re Marriage of Dawson*, 214 N.W.2d 131, 133 (Iowa 1974) (determining children's best interests were served by granting the mother physical care where the children were "healthy and well cared for," and "thrived" while in their mother's care, even though her moral misconduct and dishonesty about her conduct while testifying "weighed heavily against her," because the mother's conduct had to be balanced "against the best long-run prospects of the children").

### C. Past caretaker.

The last factor Jarrod cites is Robertta's role as the child's physical caretaker. While this factor weighs in favor of granting Robertta physical care of the child, Jarrod argues against giving the factor more weight than it deserves.

"The role of primary caretaker is . . . critical in the development of children, and careful consideration is given in custody disputes to allowing children to remain with the parent who has been the primary caregiver." *In re Marriage of Wilson*, 532 N.W.2d 493, 495 (Iowa Ct. App. 1995). Although the parent who

has traditionally served as the child's caretaker will not necessarily be granted physical care of the child, *id.*, it is a factor we must consider, Iowa Code § 598.41(3)(d) (listing "[w]hether both parents have actively cared for the child before and since the separation" as a factor to consider in determining custody). Our courts have recognized the importance of maintaining the child's emotional stability and the importance of the stability in the relationship between the child and the child's caretaker. *See In re Marriage of Williams*, 589 N.W.2d 759, 762 (Iowa Ct. App. 1998).

### D. Conclusion.

After weighing Robertta's history as the child's caretaker along with other relevant factors before us and giving the appropriate deference to the trial court, we conclude the child's best interests are served by placing the child in the care of Robertta. Accordingly, we affirm the child custody provision of the decree.

### IV. Visitation.

Jarrod argues in the alternative that the visitation awarded by the trial court does not assure the child has maximum contact with him. Specifically, he argues weekend visitation should be extended to include some weekday time prior to the child entering school, specifically, Wednesdays from 4:00 p.m. until 8:00 p.m. each week. He requests every other weekend visitation begin at 5:00 p.m. on Thursday and end at 5:00 p.m. on Sunday. He also requests he receive additional visitation in the summer, noting the fact he does not have a nine-to-five job allows him to spend more time with the child. Jarrod would like the child in his care "for a majority of the summer or in the alternative alternate full weeks."

As with custody determinations, our primary concern in determining visitation rights is the best interests of the child. *In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa Ct. App. 1992). Generally, liberal visitation rights are in the child's best interests. *Id.* We do not consider the best interests of the parent seeking visitation. *In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994).

Here, the trial court ordered liberal visitation between Jarrod and the child to the extent agreed upon by the parties. We note the default visitation schedule set forth in the decree is the minimum period of visitation allowed; the parties may agree to a more expansive visitation schedule and are expected to actively encourage positive relations between the other parent and the children. *See In re Marriage of Toedter*, 473 N.W.2d 233, 235 (Iowa Ct. App. 1991). Although the parties have the discretion to increase the amount of visitation between Jarrod and the child, we conclude the default visitation schedule provided in the decree does not provide the opportunity for maximum continuing physical and emotional contact with both parents, as required by Iowa Code section 598.41(1)(a). To offset the termination of midweek visits, we modify the default visitation schedule to adopt the GAL's recommendation and extend weekend visits to end at 5:30 p.m. on Monday when school is not in session or at the commencement of the school day when the child's school is in session.

We also modify the summer visitation provided in the decree to instead grant Jarrod the ability to extend four of his weekend visits to end at 5:30 p.m. the following Friday. This modification grants Jarrod four week-long visits with

the child, while guaranteeing the child one uninterrupted week in Robertta's care between visits.

**V. Appellate Attorney Fees.**

Both parties request they be awarded $8000 in appellate attorney fees. Whether to award appellate attorney fees is within our discretion. *Spiker v. Spiker*, 708 N.W.2d 347, 360 (Iowa 2006). An award of appellate attorney fees depends on three factors: (1) the needs of the party making the request, (2) the ability of the other party to pay, and (3) whether the party making the request was obligated to defend the trial court's decision on appeal. *Id.* We decline to award either party attorney fees.

Two-thirds of the costs of the appeal are taxed to Jarrod and one-third is taxed to Robertta.

**AFFIRMED AS MODIFIED.**