# IN THE COURT OF APPEALS OF IOWA

No. 21-0815
Filed May 11, 2022

**GINA LYNCH,**
       Petitioner-Appellee,

**vs.**

**ISRAEL MORENO,**
       Respondent-Appellant.

_____

       Appeal from the Iowa District Court for Dubuque County, Monica Zrinyi Ackley, Judge.

       A father appeals a decree establishing legal custody, physical care, visitation, and child support. **AFFIRMED AS MODIFIED.**

       Jordan D. Grube of Hope Law Firm & Associates, P.C., West Des Moines, for appellant.

       Dustin Baker of Henkels & Baker, PC, Dubuque, for appellee.

       Considered by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

During their off and on relationship, Gina Lynch and Israel Moreno had a child together. When their relationship ended for good, Moreno embarked on a campaign to prove Lynch had sexually abused their daughter. He made reports to the Iowa Department of Human Services, law enforcement, medical providers, and government officials, none of whom found any merit to his allegations.

Against this backdrop, the district court granted Lynch's request for sole legal custody and physical care of the child with supervised visitation for Moreno. On appeal,[1] Moreno claims the court erred by (1) not allowing him to introduce certain evidence; (2) not allowing him to cross-examine Lynch; (3) awarding Lynch sole legal custody and physical care; (4) placing onerous conditions on his visitation, failing to award him more visitation, and impermissibly delegating its powers to expand visitation; and (5) awarding Lynch attorney fees. We affirm as modified.

I.    **Background Facts and Proceedings**

The parties met in 2016 through an online dating site. They were never married but had a child together in June 2017. Lynch and Moreno lived together in Lynch's house in northeast Iowa until Moreno moved to Colorado for work when the child was about ten months old. He came back to Iowa twice for visits before moving back in late July 2018. Once he was back in Iowa, Moreno bounced between sleeping on Lynch's couch and a friend's couch until sometime in 2019, when Lynch told him to get the rest of his things out of her home. Shortly after

---

[1] Lynch waived her opportunity to file a brief in this appeal. *See* Iowa R. App. P. 6.903(3).

that, Moreno lodged allegations with the Iowa Department of Human Services against Lynch. Nothing came of these allegations.

In early February 2020, Lynch filed a petition to establish custody, physical care, visitation, and support. She testified that she could no longer handle Moreno showing up unexpectedly at her house or hunting her down in the community and causing a scene. Around the same time Lynch filed her petition, Moreno reported to law enforcement that he was concerned the child had suffered sexual abuse while in Lynch's care. A police officer testified that because Moreno could not provide any specific allegations, he told Moreno to take the child to a doctor. The officer never heard anything else from Moreno. Moreno proceeded to have the child undergo multiple sexual assault examinations by medical professionals, telling them Lynch or her mother had sexually abused the child.

Moreno also got the department involved, and a forensic interview of the child was conducted. The medical professionals who completed the examinations found no signs of sexual abuse, and the department issued two unfounded assessment reports.[2] For one of the assessments, Moreno provided the department worker with several videos of him questioning the child about sexual abuse. The worker noted in her report that Moreno prompted the child during questioning and asked leading questions. During the investigation, Moreno's initially vague concerns of sexual abuse crystallized into vivid and specific allegations of sexual abuse that Moreno said he either witnessed Lynch commit or

---

[2] A third unfounded assessment was issued on Moreno's report that Lynch's home was unsafe because she threw "a piece of lathe that had 50 little nails sticking out of it . . . in the front yard near the sidewalk" and that Lynch had "elbowed and slapped her daughter."

that the two-year-old child told him about. And he claimed the maternal grandmother, who watched the child during the day, was drugging her so that she could sexually abuse her. To support these claims, he sent dozens of pictures to the department, many of which simply showed Lynch and the maternal grandmother holding the child like any caretaker would. He also told the protective worker that "he knows what a sex offender is" because he was convicted of "4th degree sexual assault" when he was a teenager. The last assessment ended with a finding that Moreno "has an unusual preoccupation with [a] sexualized theme, regarding the care his daughter receives by others. He is also quick to reject reasonable explanations and medically professional opinions, regarding the care of his daughter."

Like the district court, we decline to repeat the explicit details of Moreno's sexual abuse allegations in this decision. None were credible.[3] Moreno also contacted high-ranking government officials about his cause. He even had the child urinate in a cup in a public restroom so he could have the urine tested to support his suspicions of sexual abuse. In his testimony at trial, Moreno stuck with his belief that the child was being sexually abused at the hands of Lynch or those

---

[3] For instance, Moreno claimed that before he left for Colorado, he witnessed Lynch molesting the child. He said this happened while Lynch was changing the child's diaper, and he was watching through a crack in the door. But when a department worker visited the home and tried to look through the crack, she could not see into the room where the diaper changing station would have been.

Moreno said that on another occasion, the child used sign language for a sexually explicit act. Moreno claimed that Lynch or her mother taught the child this sign because Lynch's father is deaf. But upon investigation, the department worker learned that the family has never used sign language to communicate with Lynch's father, who has seventy percent of his hearing after a cochlear implant seven years ago. The only sign language the child knows, according to Lynch and her mother, is the sign for "more."

close to her, despite multiple medical professionals and department workers finding the opposite.

The child regressed in her development as a result of Moreno's obsession with alleged sexual abuse, reverting to "baby talk" and having trouble potty-training. At a well-child visit in August 2020, the child's primary physician referred the child to a therapist to ensure her experiences did not cause any emotional or physical trauma. Before making that referral, the physician noted that she and her

> colleagues have been contacted by patient's father regarding concerns for sexual abuse . . . either by the mother or maternal grandmother. He has taken her to multiple ERs and had sexual assault examinations done on this girl. Everything has been normal. There has been no signs of sexual assault on examination.

Lynch explored many possible therapists. Moreno shot down most of them because, as far as we can tell, they were selected by Lynch. His communication with one counselor ended with an email from the counselor stating that she was feeling "harassed" and would pursue legal action if contacted again.

Moreno's testimony contained several themes. One of the main ones was that Lynch was trying to exclude him from the child's life. Yet he agreed on cross-examination that Lynch allowed him to live with her and the child after he returned from Colorado, she gave him consistent visitation after he moved out, and she complied with the visitation provisions of the temporary-matters order. He even agreed she helped him make up visits he missed. Some of the hundreds of text messages between the parties that Moreno submitted as evidence did show that Lynch was restricting unfettered visits. But those messages largely occurred in the window between the start of Moreno's sexual-abuse campaign and the entry of the temporary-matters order.

The text messages also show Lynch tried to facilitate supervised visits, but Moreno was resistant to anything but unlimited access to the child. He obsessively texted Lynch, demanding to know where she and the child were. If he didn't receive an immediate response, he would begin hounding her family members. Lynch's sister-in-law described his contact as follows: "Instead of sending one text message, he sends 22 of them in five minutes, and it is, 'Why are you ignoring me? Why are you not talking to me? Where is Gina?'" Moreno would go to Lynch's house, or her family members' houses, demanding to see his child. Lynch's sister-in-law said that he once sat outside of her house trying to take pictures of them as they were having a family dinner. She described his behavior as scary and odd.

Soon after answering Lynch's petition, Moreno moved for a hearing on temporary matters, requesting physical care of the child. In August 2020, the court awarded the parties temporary joint legal custody with temporary physical care to Lynch. Moreno's minimum visitation on a temporary basis was to include every other weekend from Thursday evening to Sunday evening and every Tuesday evening for two and one-half hours. Moreno recorded many of these interactions, submitting some of them as evidence at the trial in February 2021.

Moreno represented himself at trial, offering a confusing array of exhibits with a bizarre numbering system. In his pretrial brief, Moreno requested sole legal custody and physical care of the child. He proposed that Lynch be allowed visitation with the child "52 days of the year with holidays to be at [Moreno's] sole discretion," which he implied was generous. Following trial, and based on the

record made before it, the district court suspended Moreno's visitation under the temporary-matters order.

In its ensuing decree, the court placed the parties' child in Lynch's sole legal custody and physical care. The court did not provide Moreno with any visitation due to its belief that he needed "therapy and psychiatric intervention to address his obsession with sexual conduct." In the event Moreno "undergoes extensive psychiatric therapy and can establish he is being medicated for whatever diagnosis results," the court authorized Lynch "to permit visitation under any conditions she deems necessary to keep her daughter safe." Because of the disparity in the parties' incomes, the court awarded Lynch $2500 in attorney fees.

Moreno obtained counsel and filed a motion for a new trial or to reconsider, enlarge, or amend. As to his motion for a new trial, Moreno complained that he was not allowed to cross-examine Lynch and the court impermissibly delegated judicial authority on the issues of custody and visitation. For his motion to reconsider, enlarge, or amend, Moreno requested that his visitation be at least equal to what he had under the temporary-matters order or a graduated visitation schedule with concrete parameters for visitation not subject to Lynch's discretion. At the hearing on the motion, Moreno proposed that the court "allow for the child's therapist . . . to create a reunification plan which affords [him] visitation time with the child as the therapist deems appropriate." Lynch objected to returning to visitation as laid out in the temporary-matters order but was "receptive to developing a parenting plan through the therapist" and allowing for video and supervised visits.

The district court denied Moreno's motion for a new trial but found a "progression for visitation" would be appropriate. To accomplish that goal, the court started with virtual visits until July 2021, at which point Moreno could move to supervised visitation on alternating Saturdays provided he complied with certain conditions. After nine months, visitation could progress to unsupervised and be expanded to include alternating weekends and holidays, depending on the child's progress, Moreno's conduct, and the counselor's recommendation. The ruling provided for other potential expansions when the child reached school age. Moreno appeals.

## II.     Standard of Review

We review child-custody cases under Iowa Code chapter 600B (2020) de novo. *See McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010); *see also* Iowa R. App. P. 6.907; *Wilker v. Wilker*, 630 N.W.2d 590, 594 (Iowa 2001). Despite our de novo review, we give strong consideration to the district court's fact findings, including any credibility findings. *See Wilker*, 630 N.W.2d at 594; *see also* Iowa R. App. P. 6.904(3)(g). In child-custody cases, the first and foremost consideration is the child's best interest. *See* Iowa R. App. P. 6.904(3)(o); *Phillips v. Davis-Spurling*, 541 N.W.2d 846, 847 (Iowa 1995).

## III.    Analysis

### A.     Admission of Evidence[4]

Moreno argues the court impermissibly prevented him from introducing certain evidence, specifically (1) "an audio recording between him and a medical

---

[4] Our review of Moreno's evidentiary claims was hampered by an extremely confusing record on exhibits. While Moreno's pretrial brief did have a vague list of

provider for the parties' minor child," (2) "exhibits which showed that [he] did not need to register on the sex offender registry," and (3) "bills and statements . . . to support his argument that he does regularly attend therapy and his therapist has no concerns."

### 1. Audio recording

At trial, Moreno offered an audio recording he took of a nurse during a medical appointment with the child. The court did not admit the exhibit because Moreno recorded the nurse without her knowledge. Lynch's counsel added the exhibit was not listed as an exhibit before trial. Moreno did not ask the court to receive it as an offer of proof. On appeal, Moreno argues that the recording would have provided the court with "a more robust picture of what would have been in the best interests of the minor child"; "corroborated his testimony that although the medical examination did not prove any abuse, the examination also did not

---

categorized evidence he wished to offer, none of which related to evidence he argues was inappropriately excluded, Moreno never filed a formal exhibit list. The court refused to admit many exhibits that were not itemized on an exhibit list, explaining:

> [T]here's a difference as to what happens in a case with exhibits. First of all, most of everything that a party offers during . . . an equity trial, I take. The rules say that I give a different weight, but when you don't include it as an exhibit, [opposing counsel] is not notified of that, you're violating the rules of civil procedure, and I don't take those things.

Opposing counsel, and the court, gave him the benefit of the doubt and allowed into evidence a plethora of exhibits that Moreno electronically filed, thus giving some notice of their potential use. But, apparently, Moreno showed up to trial with hundreds of additional exhibits on paper and compact discs. Our ruling on this appeal was stalled for a significant time due to the poor maintenance of the record and its resulting status when it was transmitted to this court, which required our direction for correction.

disprove any abuse"; and "shown that [he] was only complying with law enforcement and medical professionals' recommendations for his concerns."

We agree that evidence in an equity proceeding should generally be received subject to objections. *Hughes A. Bagley, Inc. v. Bagley*, 463 N.W.2d 423, 426 (Iowa Ct. App. 1990). But because the exhibit is not before us, we have no way of knowing whether it would have been helpful or harmful to Moreno's case, and "[w]e cannot predicate error upon speculation." *In re Est. of Hansen*, 264 N.W.2d 746, 747–48 (Iowa 1978) (citation omitted). Because no request was made that the exhibit be received as an offer of proof, error was not preserved. *See In re Marriage of Wersinger*, 577 N.W.2d 866, 868 (Iowa Ct. App. 1998) ("[W]ithout an offer of proof, there is nothing for us to review.").

If the exhibit had been admitted, we have authority on appeal—even from an equitable proceeding—to disregard the exhibit as inadmissible hearsay, which it clearly was. *See, e.g.*, *In re Marriage of Hansen*, No. 18-2212, 2019 WL 3714946, at *2 n.1 (Iowa Ct. App. Aug 7, 2019); *In re Marriage of Williams*, 449 N.W.2d 878, 881 (Iowa Ct. App. 1989). In any event, based on our review of the remaining evidence, we cannot conclude admission of the exhibit for the purposes that Moreno claims it was important would have affected the overarching custody decision. *See Hansen*, 264 N.W.2d at 748. With no prejudice to Moreno, we affirm on this point. *See Hansen Lind Meyer, Inc. v. Shuttleworth & Ingersoll, P.C.*, No. 00-0808, 2002 WL 31307230, at *2 (Iowa Ct. App. Oct. 16, 2002) ("The decision to . . . exclude evidence . . . will not be disturbed on appeal absent . . . prejudice [to] the complaining party.").

*2.    Sex offender registry*

Turning to the exhibits concerning whether Moreno had to register as a sex offender,[5] those he referenced and included in the appendix do not appear to have even been discussed or offered at trial at all.[6]  So Moreno's complaint that "the court did not allow for the admission of exhibits which showed that [he] did not need to register on the sex offender registry" lacks merit and does not entitle him to any relief on appeal.

*3.    Therapy records*

As to Moreno's therapy records, he offered as evidence exhibit "8BA," which he explained was an email from his therapist.  The court responded, "So I see you have 8B . . . from A through J."  Then Moreno explained exhibit 8BA was only correspondence with the therapist, and the remainder (8BB–8BJ) were invoices.  The court questioned whether Lynch's counsel objected to the admission of exhibit 8BA, counsel responded in the negative, and the court admitted the exhibit.  The

---

[5] During Moreno's cross-examination, Moreno asserted that despite a prior conviction for a sex offense, he did not have to register as a sex offender.

[6] We note Moreno's brief often cites "proposed exhibits," which he also included in the appendix.  As an appellate practice pointer, the record that makes its way to us does *not* include proposed exhibits that are never marked as admitted by the district court in the judicial interface.  Practitioners should refrain from citing items that were not admitted and including them in the appendix, as they were not made a part of the district court record and are therefore not part of the record on appeal.  *See* Iowa Rs. App. P. 6.801 ("Only the original documents and exhibits filed in the district court case from which the appeal is taken, the transcript of proceedings, if any, and a certified copy of the related docket and court calendar entries prepared by the clerk of the district court constitute the record on appeal."), 6.905(1)(b) (indicating contents of appendix are limited to parts of the district court record); *In re Marriage of Keith*, 513 N.W.2d 769, 771 (Iowa Ct. App. 1994) ("[C]ounsel has referred to matters apparently not a part of the record of this appeal. We admonish counsel to refrain from such violations of the rules of appellate procedure.  We are limited to the record before us and any matters outside the record on appeal are disregarded.").

invoices, which were separately marked exhibits, were never offered as evidence. Following our order directing the correction of issues with exhibits, the court confirmed in its new exhibit maintenance order that exhibit 8BA was offered, received, and considered. It was therefore made part of the record on appeal. To the extent Moreno complains the email from his therapist was not admitted, Moreno is incorrect. He is not entitled to relief on the claim the court did not admit the invoices, as they were never offered as evidence.

## B.    Cross-Examination

Next, Moreno argues the "court erred in not allowing [him] to cross examine" Lynch. In denying this claim, the court noted in its ruling on Moreno's motion for new trial that Moreno managed the presentation of his case and he essentially did so inefficiently.[7] As a result, the court found his claim lacked merit.

---

[7] Most of the trial was dedicated to Moreno's six witnesses—in comparison to Lynch serving as the sole witness on her own behalf—and sorting out the confusion about Moreno's numerous unorganized exhibits—in comparison to Lynch's few organized exhibits. The record discloses that before trial, Moreno agreed only one day was needed for the trial. Trial began at roughly 9:45 a.m. Following about ten minutes of sorting out Moreno's non-compliance with pandemic-related protocol, Moreno was allowed to take his first three witnesses out of order. Their testimony took about forty minutes, very little of which included cross-examination by Lynch. Then Lynch was directly examined, which took about an hour leading up to the lunch break. After lunch ended at 12:30 p.m., two more of Moreno's witness were called out of order, and their testimony ran to about 1:50 p.m., again with very little cross-examination by Lynch. Then Moreno began his direct examination of himself, which lasted roughly ninety minutes. At the end of his direct examination, Moreno questioned the court, "I get to question Ms. Lynch, right?" The court stated it would proceed with Lynch's cross-examination of Moreno since he was already on the stand. Moreno then continued to directly examine himself and offer a flurry of exhibits, which lasted another forty minutes, bringing the clock to 4:03 p.m. Lynch's cross-examination of Moreno lasted roughly twenty-five minutes, concluding at 4:28 p.m., at which point the court ended the trial.

Cross-examination is of course an important right to a litigant and an effective aid to the factfinder in securing justice. *Pickerell v. Griffith*, 29 N.W.2d 588, 595 (Iowa 1947). While the extent of cross-examination is within the discretion of the trial court, it "is a right to be jealously guarded." *Id.* Outright refusal to allow cross-examination "is a denial of an absolute right, and has been generally held to be sufficient ground for reversal," *id.* (citation omitted), so long as prejudice resulted, *Avery v. Harms Implement Co.*, 270 N.W.2d 646, 649 (Iowa 1978); *see also In re Marriage of Ihle*, 577 N.W.2d 64, 69 (Iowa Ct. App. 1998). "Only after a party has been afforded an opportunity for full and fair cross-examination may the trial court limit its scope." *Avery*, 270 N.W.2d at 650.

But, as the supreme court has explained, "cross-examination is limited to matters testified to in chief." *Jack v. P & A Farms, Ltd.*, 822 N.W.2d 511, 520 (Iowa 2012) (quoting *Avery*, 270 N.W.2d at 650). Moreno complains he "could not refute any allegations that [Lynch] made in her testimony," and he "was not afforded an opportunity to confront [Lynch] with her lack of attention to his concerns and her failure to communicate and co-parent." However, Lynch's testimony was limited to her background; the child's birth and the parties' relationship; the reasons she sought a custody decree; her involvement in the department's investigations; the parties' efforts at securing a therapist for the child; and visitation under the temporary-matters order, which Lynch opined has "been working." She also testified the child loves Moreno and enjoys spending time with him. While she provided some foundation for the department's investigative reports, those reports were admitted as evidence without objection from Moreno. And Lynch specifically

agreed the parties could not effectively communicate and co-parent with one another—a central theme of Moreno's case.

"A party is not denied a fair trial by the denial of the opportunity to cross-examine a witness who does not give any testimony" on issues the party wants to delve into on cross-examination. *See id.*; *accord* 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.611:3 (Nov. 2021 update). Because Lynch did not testify about the issues Moreno complains about on appeal, we find Moreno was not denied an affirmative right to cross-examine her. Along the same lines, we find that no prejudice resulted from the court's failure to allow Moreno to cross-examine Lynch given the other evidence in the record.

In support of his theme that the parties could not communicate with one another, Moreno submitted hundreds of text messages between the parties, along with dozens of videos. He also testified about this subject himself after Lynch's testimony concluded, along with his concerns about sexual abuse and her response to those concerns. Moreno's sexual-abuse concerns were thoroughly vetted by the department and found uncredible in the reports Moreno stipulated could come into evidence. Moreno's lack of organization resulting from his decision to proceed without counsel led to a large chunk of the trial being squandered. His cross-examination of Lynch about the issues he raises on appeal would have been further "unnecessary time consumption" and repetitive of other evidence. *See* Doré, § 5.611:2. We affirm the district court on this point.

**C.    Legal Custody and Physical Care**

Moreno next claims the court erred in placing the child in Lynch's sole legal custody. The factors set forth in Iowa Code section 598.41 apply to custody

determinations in proceedings under Iowa Code chapter 600B. *See* Iowa Code § 600B.40(2). Custody decisions turn on the child's best interests and should "assure the child the opportunity for the maximum continuing physical and emotional contact with both parents" and "encourage parents to share the rights and responsibilities of raising the child unless direct physical harm or significant emotional harm to the child . . . is likely to result from such contact with one parent." *Id.* § 598.41(1)(a). From these principles, we have said the "legislature and judiciary of this State have adopted a strong policy in favor of joint custody from which courts should deviate only under the most compelling circumstances." *In re Marriage of Winnike*, 497 N.W.2d 170, 173 (Iowa Ct. App. 1992). Those compelling circumstances are present here.

We have no concerns for Lynch's suitability as a custodian for the child. *See* Iowa Code § 598.41(3)(a). But as for Moreno, we agree with the district court that "the child has digressed in her development while in" his limited care. Though Moreno complains no expert testimony was offered about the child's regression, an expert was not needed for the court to read the writing on the wall. Moreno's pattern of conduct—namely continuing his obsessive campaign about sexual abuse of the child at the hands of Lynch despite repeated and consistent findings to the contrary—shows he is willing to put his own desires over the child's best interests. Thus, we have serious concerns for Moreno's suitability as a custodian.

As to the child's psychological and emotional needs and development, *see id.* § 598.41(3)(b), it is undisputed that the child loves Moreno and enjoys spending time with him. That said, the child is young and used to Lynch serving as her primary custodian. *See id.* § 598.41(3)(d). Because the child will have visitation

with Moreno, albeit under certain conditions, we cannot conclude she will suffer psychologically or emotionally due to lack of contact or attention from Moreno. The opposite instead appears to be true. Like the district court found, Moreno "created a hostile environment focused on his misguided obsession with sexual assault," which harmed the child. *See Knotek v. Mellin*, No. 19-16000, 2020 WL 5229429, at *8 (Iowa Ct. App. Sept. 2, 2020) (finding "continuous unfounded abuse reports operates a significant emotional harm to these children").

It is also undisputed that the parties' ability to communicate with each other about the child's needs is strained. *See id.* § 598.41(3)(c). This is largely due to Moreno's sexual-abuse campaign against Lynch. But even after his sordid allegations, Lynch mostly responded to him courteously and refrained from disparaging him. *See In re Marriage of Jacobson*, 2018 WL 1633512, at *4 (Iowa Ct. App. Apr. 4, 2018) (affirming decision placing a child in the father's physical care where despite the mother's "outrageous conduct," the father remained courteous). It also does not help that Moreno appears to lack the understanding that Lynch, who works full time, can't respond to each of Moreno's incessant text messages mere moments after he sends them. Even setting up basic routine matters about the child's physical and mental health has been a constant tug of war. While tension alone is not sufficient to deny joint legal custody, the parties' inability to communicate and cooperate rises above the "usual acrimony that accompanies" parental separation. *See In re Marriage of Gensley*, 777 N.W.2d 705, 715 (Iowa Ct. App. 2009) (citation omitted). The parties appear to recognize this considering that neither asked for joint legal custody. *See* Iowa Code § 598.41(3)(g).

We also have concerns about the viability of a joint custody relationship in light of Moreno's inability to support Lynch's relationship with the child.  *See id.* § 598.41(3)(e).  It is true that Lynch restricted the frequency of Moreno's visitation early on in the proceedings.  But she did so only after she learned the details of what Moreno put the child through to try to support his claims of abuse—the multiple and unnecessary invasive physical examinations by medical professionals, the surreptitious collecting of the child's urine in a public bathroom, and Moreno's incessant questioning and recording of the child.  Before then, she allowed Moreno regular and unsupervised contact with their daughter.  And once the temporary order was entered, she substantially complied with its visitation provisions.  Moreno, on the other hand, has continued to try to undermine the relationship between Lynch and the child by attempting to identify Lynch as a sexual abuser.  *See Winnike*, 497 N.W.2d at 174 (discussing significance of false sexual abuse allegations made by mother in making custody determination); *see also Knotek*, 2020 WL 5229429, at *8; *In re Marriage of Rosenfeld*, 524 N.W.2d 212, 215–16 (Iowa Ct. App. 1994).  His conduct "is serious and should not be tolerated."  *Knotek*, 2020 WL 522949, at *8.

The foregoing clearly and convincingly shows "that joint custody is unreasonable and not in the best interest of the child to the extent that the legal custodial relationship between the child and a parent should be severed."  Iowa Code § 598.41(2)(b).  So, on our review, "[w]e agree with the district court that this is one of the rare cases where sole legal custody is appropriate and in the best interests of the child[]."  *Gensley*, 777 N.W.2d at 717.  We accordingly affirm the

award of sole legal custody.  As a result, we need not address the court's award of physical care to Lynch.  *See id.* at n.7; *see also* Iowa Code § 598.41(5)(a).

Moreno relatedly requests that we "expand the sole legal custody provision to include that he is permitted access to the child's medical, educational, and health records."  The decree did not specifically restrict him from having such access.  To the extent it may be interpreted as doing so, we modify the decree to allow Moreno legal access to the child's "medical, educational and law enforcement records."  *See* Iowa Code § 598.41(1)(e).

### D.    Visitation

Turning to Moreno's visitation with the child, he first complains the decree impermissibly delegated discretion over visitation to Lynch.  Assuming without deciding that it did, the district court revisited its visitation determination in its ruling on Moreno's motion to reconsider, enlarge, or amend.  So we start from there.

The court's ultimate decision on visitation provided for graduated visitation.  To begin, following entry of the final ruling in mid-May 2021, Moreno was authorized virtual contact with the child four days each week for fifteen minutes.  Beginning in July, and contingent upon Moreno providing his therapist with the department's investigative reports and the decree and participating in therapy, his visitation would increase to include supervised contact every other Saturday from 10:00 a.m. to 5:00 p.m.  Visits would progress to unsupervised after nine months and expand to include every other Saturday and Sunday, conditioned upon the child's counselor's recommendation and Moreno's monthly participation in therapy.  When the child reaches school age, visits can occur in Moreno's home

state of Wisconsin. The decree also authorized Lynch to expand visitation as she sees Moreno progress.

Moreno argues this visitation plan placed "onerous conditions" on his parenting time. But while he notes the court required him to provide his therapist with the department's investigative assessments and the court's decree, Moreno makes no claim this was inappropriate. He goes on to complain "[t]he trial court then permitted [Lynch] to have power over increasing visitation as she felt appropriate," based on his attendance at counseling. The problem with this claim is that pretty much every decree involving the custody of children permissibly allows the physical-care parent to increase visitation over the minimum ordered by the court. Here, in its expanded ruling, the district court did not order that *any* visitation be at the discretion of Lynch, which would be reversible error. *See, e.g.*, *Thompson v. Fowler*, No. 17-0284, 2017 WL 6513973, at \*2–3 (Iowa Ct. App. Dec. 20, 2017). It instead provided graduated minimums and authorized Lynch to exceed those minimums, which is commonplace.

Next, Moreno complains the court gave him no in-person contact with the child until July 2021. Yet he offers no suggestion on what relief we can provide him now. That small window of time where he was only allowed virtual visits has come and gone and is now moot. *Cf. Calcutt v. Calcutt*, 320 S.E.2d 55, 59 (S.C. Ct. App. 1984) (finding challenge to six-month waiting period before visitation could begin moot because the period had expired and no controversy remained).

Moreno next disputes the plan for him to progress to unsupervised visits and the amount of time he is allowed. But sometimes, like here, conditions on visitation are justified. *See In re Marriage of Rykhoek*, 525 N.W.2d 1, 4 (Iowa Ct.

App. 1994); *see also* Iowa Code § 598.41(3)(i). "Additionally, a parent may agree to a condition on his or her visitation . . . ." *Rykhoek*, 525 N.W.2d at 5.

At the hearing on the motion to reconsider, Moreno argued that if the court declined to immediately reinstate the temporary-visitation schedule (the denial of which we agree was appropriate), the court should instead implement "a graduated visitation schedule with the minor child through reunification efforts" that would "allow for the child's therapist . . . to create a reunification plan which affords Mr. Moreno visitation time with the child as the therapist deems appropriate," all aimed at creating "a visitation schedule that would gradually get the parties back to the every-other-weekend schedule that they exercised prior to this trial." That is essentially what the court did, so Moreno has no cause to complain now. *See, e.g., Jasper v. State*, 477 N.W.2d 852, 856 (Iowa 1991) (noting a litigant "cannot deliberately act so as to invite error and then object because the court has accepted the invitation"); *Odegard v. Gregerson*, 12 N.W.2d 559, 562 (Iowa 1944); *In re Marriage of Carter*, No. 18-2157, 2019 WL 3714935, at *5 (Iowa Ct. App. Aug. 7, 2019); *In re Marriage of Koster*, No. 16-1583, 2017 WL 6040575, at *7 (Iowa Ct. App. Dec. 6, 2017). This also defeats Moreno's claim that the court "made an impermissible delegation of power to the therapist." *Cf. In re Marriage of Schmidt*, No. 13-0675, 2014 WL 2432549, at *8 (Iowa Ct. App. May 29, 2014). Moreno specifically agreed the therapist should weigh in on the matter, so he cannot complain now that the court imposed this condition.

While we do find some of the triggering events for Moreno's increased visitation to be arbitrary—like the nine-month waiting period—that period has already passed. At this point, Moreno should be exercising unsupervised visitation

on alternating weekends provided that "the child is progressing, there are no issues with [Moreno's] conduct, and the counselor makes a recommendation for expansion of the visitation." Either party may make application to the district court to enforce this provision of its ruling, which we find appropriate under the circumstances presented here. *See, e.g.*, *In re Marriage of Strong*, No. 07-1085, 2008 WL 509071, at *1 (Iowa Ct. App. Feb. 27, 2008) (finding the "therapeutic/supervised visitation provisions and subsequent reporting to the court before additional visitation determinations are made to be appropriate").

Lastly, Moreno raises various complaints about the alleged lack of specificity in the district court's orders on logistics for virtual visits, exchange location, and visitation supervisors. We find the district court's orders about the former two issues sufficiently specific to guide the parties. As to supervisors, we have no idea about the current status of visitation or arrangements the parties may have put in place while this appeal has been pending. And Moreno does not provide us with any specific request for relief on this point. We decline to formulate one for him. If the selection of appropriate visitation supervisors remains an issue, Moreno may pursue resolution of the issue in the district court.

### E.    Attorney Fees

Moreno finally argues the district court abused its discretion by awarding Lynch trial attorney fees. The court may award attorney fees to a prevailing party in a proceeding under Iowa Code chapter 600B. Iowa Code § 600B.26. We review such an award for an abuse of discretion. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). "An award of attorney's fees is based on the parties'

respective needs and ability to pay." *In re Marriage of O'Rourke*, 547 N.W.2d 864, 867 (Iowa Ct. App. 1996).

Moreno traversed most of the proceedings and all of trial without counsel, throughout which his disorganization and inefficiency increased Lynch's attorney fees. As Lynch explained in her testimony, Moreno "filed over . . . hundreds and hundreds of exhibits, and my attorney had to take the time to go through all of them, um, or most of them, or what he could get through. . . . I'm getting billed for that." The district court determined Lynch's annual income to be $27,000 and Moreno's to be $70,000. On our review, we find the district court's award to be in line with Lynch's need and Moreno's ability to pay and affirm.

## IV.    Conclusion

We affirm on all of the evidentiary issues raised by Moreno. We also affirm the district court's decision to place the child in Lynch's sole legal custody and physical care. To the extent that the decree restricted Moreno from accessing certain records of the child's, we modify the decree to allow Moreno legal access to the child's medical, educational, and law enforcement records. We affirm the visitation plan ordered by the district court and the award of attorney fees in favor of Lynch. Costs on appeal are taxed to Moreno.

**AFFIRMED AS MODIFIED.**