# IN THE COURT OF APPEALS OF IOWA

No. 22-1350
Filed May 10, 2023

**GEORGE WILKIE WATSON,**
    Plaintiff-Appellee,

**vs.**

**CASSIDY LEE OLLENDIECK,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Howard County, Richard D. Stochl, Judge.

A mother appeals a custody decree placing the parties' child in their joint physical care. **AFFIRMED IN PART AND REMANDED.**

Stephen J. Belay of Anderson, Wilmarth Van Der Maaten, Belay, Fretheim, Gipp, Evelsizer Olson, Lynch & Zahasky, Decorah, for appellant.

Kevin E. Schoeberl of Story, Schoeberl & Seebach L.L.P., Cresco, for appellee.

Considered by Bower, C.J., and Badding and Buller, JJ.

**BADDING, Judge.**

Cassidy Ollendieck and George (Will) Watson are the young parents of a child who was born when they were still teenagers. After a rocky start to their co-parenting relationship, the district court found their communication was "pretty good, actually almost unexpected." As a result, the court granted Will's request for joint physical care of the child. Cassidy appeals, claiming the court (1) should have placed the child in her physical care and (2) "incorrectly omitted a parenting plan from its determinations." We affirm in part and remand the case to the court to set a specific parenting schedule.

## I. Background Facts and Proceedings

Cassidy and Will started dating when they were in high school. The parties learned Cassidy was pregnant in June 2019, when Will was about seventeen and Cassidy was nineteen. Will testified their relationship was rocky at that time because Cassidy was involved with someone else, although she and Will were still dating. In October 2019, Cassidy moved to North Carolina to live with her parents, who had relocated there after she graduated high school. Will stayed in Iowa to finish high school, graduating early in December. The child was born in North Carolina in February 2020.[1] A week or two later, Will went to North Carolina and lived there with Cassidy and the child for about a month.

Cassidy visited Iowa several times after the child was born, though she rarely let Will know when she was coming. Will testified he would contact Cassidy to see the child when he heard they were back. Cassidy would let him, but "always

---

[1] Will's paternity of the child was established before the child's birth by an in utero test.

under her conditions," meaning she had to be present. Their relationship kept bumping along until December 2020, when Cassidy and Will decided to try living together in Iowa as a family. They moved into Cassidy's grandmother's home in January 2021 and lived there together with their child until July. Cassidy testified that she and Will "got in an argument . . . and he just packed up and moved out to his grandma's." But they continued their relationship, spending time together as a family when Will wasn't working. According to Will, however, Cassidy refused to let the child stay with him overnight after they began living separately.

Cassidy relented in early September, agreeing to let the child stay with Will alone because she was tired from working. When Cassidy went to get the child the next morning, Will refused to send the child with her. Cassidy said that their standoff continued for three or four days, although Will testified that it was only two. In any event, before Will would let the child leave his care, Cassidy testified that he made her agree to a "2-2-3" alternating care schedule. Will explained at trial that he wanted something set in stone so that Cassidy would not move to North Carolina again and take the child with her. He was also concerned about Cassidy's mental health, which she denied was an issue.

In September 2021, just before the parties had their falling out, Will petitioned the district court for joint legal custody and physical care of the child under Iowa Code chapter 600B (2021), with an alternative request for joint physical care. In her answer, Cassidy agreed to joint legal custody but asked for the child to be placed in her physical care, subject to reasonable visitation for Will. Soon after, the parties filed competing motions on temporary physical care. Following

an abbreviated hearing, the district court found that temporary joint physical care was not in the child's best interest because:

> Cassidy provided a large majority of the care for [the child] since [she] was born, Will and Cassidy have had communication and mutual respect problems, and these parents appear to struggle putting their animosity for each other aside to work together to make the co-parenting decisions which frequently arise in joint physical care arrangements.

The court placed the child in Cassidy's temporary physical care with visitation for Will every other weekend from Friday evening to Sunday evening and every Tuesday and Thursday evening from 5:30 p.m. until 8:00 p.m. The order encouraged Cassidy "to grant Will additional time, which may include earlier pickup times, later drop-off times, and additional full days when any of this is feasible, especially when Will is laid off."

The court's reference to times when Will is laid off was due to his seasonal work as a dump-truck driver for a rock product company. From around December to March each year, Will is laid off and does not work. But during the spring, summer, and fall months, he works from around 5:30 a.m. until 6:00 p.m. While the temporary order was in place, Will had to miss a few of his mid-week visits due to out-of-town work, but that was atypical. Cassidy did allow him extra time with the child during his layoff period, but she denied his requests for more overnights. And she refused to allow his family to help with transportation on nights when he had to work past 5:30 p.m. Cassidy believed that Will's mother provided most of the care for the child during Will's mid-week visits, which they usually spent at Will's mother's house. Will denied this, testifying that he exercised his mid-week visits at his mother's house so that he could maximize the short time he had with the

child since he lived about thirteen miles outside of town. Will told the court that if his request for joint physical care was granted, he would find a different job with a more accommodating schedule.

Cassidy has a more flexible schedule than Will, having run an in-home daycare out of her residence since October 2021. She lives in a duplex, while Will owns a home on a small acreage. Since the temporary hearing, the parties have been able to work together to rearrange parenting time. They have eaten dinner together several times and Cassidy has spent the night at Will's house with the child a few times. And while Cassidy has been the one to make the medical appointments for the child, she and Will attend them together. Although Will's family is present during his mid-week visits with the child, she spends the alternating weekends at his house, where he provides all the care for her.

Against this backdrop of improved communication and co-parenting, a two-day trial was held in July 2022. In its August decree, the district court found that "both parties have made significant progress" since the temporary hearing. The court noted that although Cassidy "offered numerous text messages sent before October of 2021 showing their difficulties in communicating," there were "none since that time," with Cassidy agreeing that "communication has gotten 'a lot' better." In sum, the court found "[b]oth parties love and are loved by their child" and "capable of providing for her physical, financial, and emotional support." The court concluded:

> Will and Cassidy have demonstrated an ability to communicate effectively. There does not appear to be any substantial conflict between them. The evidence suggests they are in general agreement about their approach to daily matters. Cassidy

presented no evidence to the contrary.  Shared placement is in the best interest of [the child].

As for the parenting schedule, the court stated: "While this court does not favor frequent switching of care (2-2-3) and prefers a week on-week off arrangement, the parties' wishes shall be followed."  The court directed Cassidy and Will to meet and prepare a "proposed joint physical care parenting plan," to be submitted to the court within thirty days.  If the parties could not reach an agreement, the court stated "a hearing will be set and the court will receive further evidence to determine the cause of the disagreement and a possible resolution."  Cassidy appealed the court's decree before any plan was submitted.[2]

## II.     Standard of Review

We review child-custody cases under Iowa Code chapter 600B de novo.  *See McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010); *see also* Iowa R.

---

[2] Before reaching the merits of Cassidy's appeal, we considered whether the decree was interlocutory because the court noted its intention to take further action on the parenting schedule.  While the court retained jurisdiction to address that issue—a practice our appellate courts have discouraged—we still find the decree was a final appealable order.  *See Shipley v. Shipley*, 182 N.W.2d 125, 128 (Iowa 1970) (holding that a decree that dissolves a marriage but reserves a subsidiary issue for future determination is still a final decree for purposes of appeal); *see also In re Marriage of Fenchel*, 268 N.W.2d 207, 209 (Iowa 1978) (concluding the rules and statutes governing dissolutions "contemplate one final decree" terminating the marriage and stating if that decree is supplemented by a later one, "only the supplementary decree may then be appealed"); *Elmquist v. Nairn*, 98-1843, 2000 WL 372555, at *1 (Iowa Ct. App. Apr. 12, 2000) (addressing a father's appeal from the denial of his request for physical care where the court "reserved jurisdiction on the issue of visitation in order to allow the parties to reach a mutually workable schedule"); *In re Marriage of Jensen*, 396 N.W.2d 367, 368 (Iowa Ct. App. 1986) (reaching wife's challenge to a spousal support award where the court retained jurisdiction to address child support if the parties could not agree on their obligations).  *But see In re Marriage of Graziano*, 573 N.W.2d 598, 599 (Iowa 1998) (concluding a decree entered after a dissolution trial that "addressed only the children's custody, and specified that other issues would be reserved for further order of the court" was interlocutory).

App. P. 6.907; *Wilker v. Wilker*, 630 N.W.2d 590, 594 (Iowa 2001). This requires an examination of the whole trial record to decide anew the issues raised on appeal. *See Wilker*, 630 N.W.2d at 594. Despite our de novo review, we give strong consideration to the district court's fact findings, including any credibility findings. *See id.*; *see also* Iowa R. App. P. 6.904(3)(g).

## III. Analysis

### A. Physical Care

Cassidy claims the district court "incorrectly determined that joint physical care is in [the child's] best interests." Our first and foremost consideration is, of course, the child's best interest. *See* Iowa R. App. P. 6.904(3)(o); *Phillips v. Davis-Spurling*, 541 N.W.2d 846, 847 (Iowa 1995). "The objective of a physical care determination is to place the child[] in the environment most likely to bring [the child] to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

"The criteria used in making the physical care determination are the same for married and unmarried parents." *Flick v. Stoneburner*, No. 15-1930, 2016 WL 2743449, at *1 (Iowa Ct. App. May 11, 2016) (citing *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988)). We consider the factors set out in Iowa Code section 598.41(3) and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974),[3] though the following nonexclusive factors, which Cassidy focuses her

---

[3] "The factors the court considers in awarding custody are enumerated in Iowa Code section 598.41(3)." *In re Marriage of Courtade*, 560 N.W.2d 36, 37 (Iowa Ct. App. 1996). "Although Iowa Code section 598.41(3) does not directly apply to *physical care* decisions, . . . the factors listed here as well as other facts and circumstances are relevant in determining" physical care. *Hansen*, 733 N.W.2d at 696.

argument on, are the key considerations in determining whether a joint-physical-care arrangement is in a child's best interest:

> (1) "approximation"—what has been the historical care giving arrangement for the child[ren] between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (quoting *Hansen*, 733 N.W.2d at 697–99).

Starting with approximation, Cassidy argues this factor weighs in her favor because she "has served, informally at first and then formally based on the temporary order as the primary physical caretaker" for the child. The historical caregiving arrangement, while important, is not dispositive. *See Flick*, 2016 WL 2743449, at *2 (collecting cases placing a child in the physical care of the parent who was not previously the primary caretaker); *see also In re Marriage of Delagardelle*, No. 11-1907, 2012 WL 4097259, at *2 (Iowa Ct. App. Sept. 19, 2012). And it loses significance "where the historically less-involved parent has proven to be a capable caregiver," as Will has here. *Delagardelle*, 2012 WL 4097259, at *2; *accord Elsener v. Cochran*, No. 12-1647, 2013 WL 3871088, at *1–2 (Iowa Ct. App. July 24, 2013) (finding "[t]his is a textbook case for joint physical care," despite mother's status as primary caregiver while father worked more outside the home and had less involvement since parties stopped cohabitating). He has taken an active role in the child's life—spending as much time with her as Cassidy will allow. So we do not afford this factor much weight.

The second and third factors, having to deal with communication, respect, and conflict, also do not weigh against joint physical care, as Cassidy argues. While the parties did have some communication problems during their relationship and its immediate aftermath, those problems did not persist past the September 2021 incident when Will kept the child in his care for a few days. *See Dietz v. McDonald*, No. 08-0129, 2008 WL 5234524, at *7 (Iowa Ct. App. Dec. 17, 2008) ("[S]ome failures of communication and cooperation are not surprising with the breakup of a romantic relationship and must be viewed in that context."). Cassidy acknowledged as much at the temporary hearing,[4] when she denied that the parties' communication was an impediment to joint physical care: "Q. Ms. Ollendieck, you indicate that you don't think the joint physical care arrangement will work out because of communication? A. No, it's because he does not have the vested time to spend with her." And at the custody trial, Cassidy agreed that since the temporary hearing, she and Will "have gotten along pretty well."

There was no evidence to corroborate Cassidy's general testimony that Will "has a really bad temper," is impatient with the child, or controlling with her. *Cf. In re Marriage of Ransom*, No. 08-0742, 2008 WL 4877545, at *3–4 (Iowa Ct. App. Nov. 13, 2008) (detailing examples of a parent's controlling and disrespectful attitude toward the other parent). Indeed, the journal that Cassidy offered into evidence confirmed the parties' ability to co-parent, documenting several times when Cassidy and the child ate dinner with Will or stayed at his place after the

---

[4] The transcript of the temporary hearing was admitted at trial as an exhibit.

temporary order was entered. This is not a case in which the level of discord and mistrust between the parties is so high as to make joint physical care unworkable. *Cf. In re Marriage of Terrones*, No. 20-0538, 2020 WL 7021557, at *3 (Iowa Ct. App. Nov. 30, 2020) (discussing the many communication problems between the parties that included disputes about things like whether the child should wear a headband for a school picture).

As for the last factor, which examines whether the parties are in general agreement about their approach to daily matters, Cassidy focuses on their differing opinions on when the child should start potty training. The record shows this is a minor issue that will soon sort itself out and not one "of such magnitude as to preclude an award of shared care." *See In re Petesch*, No. 10-1984, 2011 WL 2697060, at *1 n.1 (Iowa Ct. App. July 13, 2011) (giving disagreement about potty training "little if no consideration").

In sum, we agree with the district court that it is in this child's best interest to be placed in her parents' joint physical care.

## B.    Parenting Schedule

Cassidy next claims that because of the parties' difficulties communicating with one another, the district court should have ordered a set parenting schedule rather than leaving that issue for them to sort out.[5] We agree, though not because of any communication problems between the parties.

---

[5] Without elaboration, Will argues that Cassidy did not preserve error on this claim because she did "not raise the issue of lack of parenting plan by post decree motion." *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). But this is not a case in which the district court overlooked or was silent on an issue.

While Iowa Code section 598.41(5)(a) does give the court discretion to "require the parents to submit, either individually or jointly, a proposed joint physical care parenting plan," the statute requires that step to be completed "[p]rior to ruling on the request for the award of joint physical care." This is because the parenting schedule for a joint-physical-care arrangement, like visitation, goes "hand in hand with custody orders and inhere[s] in final determinations of custody." *Piechowski v. Shufro*, No. 12-1225, 2013 WL 4010245, at *1 (Iowa Ct. App. Aug. 7, 2013). The court "may not delegate its judicial power to determine visitation or custody arrangements *to the parties* or a third party." *In re Marriage of Stephens*, 81 N.W.2d 523, 530 n.3 (Iowa Ct. App. 2012) (emphasis added); *accord Smith v. Smith*, 142 N.W.2d 421, 425 (Iowa 1966) ("The feasible exercise of a parent's right of visitation should be safeguarded by a definite provision in the order or decree of the court awarding custody of the child to another person." (citation omitted)). That decision should instead be made by the court. *See In re Marriage of Schmidt*, No. 13-0675, 2014 WL 2432549, at *8 (Iowa Ct. App. May 29, 2014) (stating chapter 598 "mandates the district court to intercede in a dissolution-of-marriage proceeding to order custody and visitation").

Though the court can allow the parties to exercise additional visitation or parenting time as they may agree, the court should include a fall-back schedule in its decree in the event the parties cannot agree. *See, e.g.*, *In re Marriage of*

---

Instead, the court considered the schedule that should be used by the parties, noting it "does not favor frequent switching of care (2-2-3) and prefers a week on-week off arrangement," before deciding that "the parties' wishes shall be followed." Because the court's decree shows that it "*considered* the issue and necessarily ruled on it," we find that error was preserved. *Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012).

*Heiar*, 954 N.W.2d 464, 473 (Iowa Ct. App. 2020) (affirming the "visitation schedule in the decree but emphasiz[ing] that these are minimum guildelines and parents can certainly agree to expand time beyond what is ordered"). Because the court did not do that here, we remand this case to the district court to set a specific parenting schedule for the parties.

### C. Appellate Attorney Fees

Both parties ask for an unspecified amount of appellate attorney fees from each other, unsupported by any attorney fee affidavits or other documentation. Iowa Code section 600B.26 permits an award of appellate attorney fees to the prevailing party. *See Schaffer v. Frank Moyer Const. Inc.*, 628 N.W.2d 11, 23 (Iowa 2001) (holding that statute allowing trial attorney fees also permits an award of appellate attorney fees). But after considering the relevant factors, we conclude both requests should be denied. *See Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005) ("Whether such an award is warranted is determined by considering 'the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal.'" (citation omitted)).

## IV. Conclusion

We affirm the district court's decision to place the parties' child in their joint physical care but remand the case to the court to set a specific parenting schedule. Both parties' requests for appellate attorney fees are denied, and costs on appeal are assessed equally between the parties.

**AFFIRMED IN PART AND REMANDED.**