**IN THE COURT OF APPEALS OF IOWA**

No. 24-1807
Filed October 1, 2025

**TRAVIS GLEN MCCOY,**
     Petitioner-Appellant,

**vs.**

**JESSICA ANN SMITH,**
     Respondent-Appellee.
_____

Appeal from the Iowa District Court for Scott County, Meghan Corbin,

Judge.


A father appeals the district court's custody decree granting the mother

physical care of their minor daughter.  **REVERSED AND REMANDED.**


Jason S. Rieper of Rieper Law, P.C., Des Moines, for appellant.

Jessica Smith, Eldridge, self-represented appellee.


Considered without oral argument by Schumacher, P.J., and Buller and

Sandy, JJ.

**SANDY, Judge.**

Travis McCoy appeals the district court's custody decree granting Jessica Smith physical care of their minor daughter. On appeal, McCoy contends the district court erred by *sua sponte* setting aside a previous order that found Smith to be in default. Additionally, he contends the district court erred by placing physical care of the child with Smith.

We elect to assume without deciding that the district court had authority to set aside the default judgement and proceed to the merits of the appeal. We reverse the district court's ruling awarding physical care to Smith and instead award physical care to McCoy. We remand for entry of an order consistent with this opinion and direct the district court to establish a visitation schedule for Smith, as well as a child support obligation for Smith.

## I. Background Facts and Proceedings

McCoy and Smith met via an online dating app and began a romantic relationship in early 2022. Their relationship developed quickly, and Smith subsequently moved in with McCoy at his home in Gladstone, Illinois during the summer of 2022.[1] The couple never married, but their relationship produced a daughter—E.M., born in 2024.

According to Smith, her relationship with McCoy was "toxic." As she explained at the custody trial, "it was a toxic relationship between me and Mr. McCoy and . . . it has ended because of its toxicity." Their relationship was marred by frequent heated arguments, with both parties admitting to destroying

---

[1] At all times during the pendency of this case, McCoy has lived in Gladstone.

furniture during such arguments. Additionally, McCoy and Smith accused each other of physical abuse. Smith testified that they "both played a role in being abusive physically and mentally to each other."

In November 2023, McCoy and Smith's turbulent relationship came to an abrupt end after an argument one evening at McCoy's home. During this particular argument, Smith threatened self-harm. Of note, this occurred while Smith was pregnant with E.M. In response to Smith's threat of self-harm, McCoy testified that he "took her to the hospital in Burlington, and she committed herself to the psychiatric ward, and then, I proceeded to go to the police station and file what I thought was a report in regard to her safety."[2] Additionally, McCoy detailed in his testimony that Smith has an extensive history of threatening self-harm and suicidal ideations. According to him, she threatened self-harm at least four times during the course of their relationship.[3]

McCoy recounted that Smith once attempted to retrieve a handgun from his truck in an attempt to kill herself. As he explained:

> The second time, we were in a fight. She ran out to my truck and grabbed a pistol out of the back of my truck, and I had to run out there and try to get it out of her hands while she was trying to load the magazine in it, and that was the first big time.

During her testimony, Smith conceded that she has struggled with suicidal ideations in the past. Smith testified that while she was pregnant with E.M., she

---

[2] In her testimony, Smith confirmed that she admitted herself for mental health treatment at the hospital in Burlington.

[3] Of relevance to us, trial testimony was provided by a Bettendorf Police Officer, Eric Poirier, who found a suicide note from Smith dating back to 2019—years before Smith began a relationship with McCoy. Poirier had been responding to a call for a welfare check on Smith.

once held a knife to her stomach and threatened to harm the then-unborn child.[4] According to her, she did this because she "was under mental distress."  She also admitted to previously being hospitalized for her mental health "two other times."  Smith disclosed that she suffers from depression, but she testified that she currently takes her prescribed antidepressants "every single day."  She added that she regularly sees a therapist to treat her depression.

According to McCoy, Smith only stayed in the psychiatric ward at the hospital in Burlington for a "night or two."  After leaving the hospital, she moved into her mother's house in Davenport.  She resided with her mother until E.M.'s birth and for a brief period thereafter.  While living with her mother following E.M.'s birth, Smith would only permit McCoy to see the child for brief visits in the cab of his truck.  As she explained:

> My mother runs an at-home childcare, and she does not like Travis, and it is her place of residence, she should not have somebody in her household that she does not want them to be there.  So I tried to work around it as best as I could so that he could see E.M., and the best likelihood that I could think of was outside in his truck.

However, when E.M. was roughly three months old, Smith and the child moved in with McCoy at his home in Gladstone.  But this arrangement only lasted a week because McCoy and Smith got into an argument over whether McCoy could take E.M. to church with him.  According to McCoy, it "was another big argument" and the "cops were called."  Smith and E.M. subsequently moved out of McCoy's home and stayed one night at the home of one of Smith's ex-boyfriends in Davenport.

---

[4] In text messages between Smith and McCoy's mother—which were admitted into evidence—Smith wrote, "I did have a plan for after she was born to kill myself."  This text was April 4, 2024, three months after the child was born.

Smith and E.M. then lived with one of Smith's cousins for two months in Eldridge. Eventually, Smith was able to obtain a job and secure a two-bedroom apartment in Eldridge, where she currently lives with E.M. and her seven-year-old daughter from a previous relationship. Smith testified that she is currently employed as a server at a small restaurant in Park View and earns roughly $2200 a month before taxes.

At the time of the custody trial, McCoy still lived in his home in Gladstone. He is currently employed at an industrial machine maintenance company in Muscatine and earns thirty dollars per hour. His normal work schedule is 7:00 a.m. to 3:30 p.m., Monday through Friday. He testified that he currently does not work weekends. However, he testified that it generally takes him an hour and fifteen minutes to drive from his home in Gladstone to his job in Muscatine.

Concerned with Smith's mental health, McCoy filed a petition to establish paternity, custody, and child support in February 2024. As part of his petition, he requested that the parties be granted joint legal custody but that physical care of E.M. be placed with him. Smith—representing herself pro se—did not file an answer to the petition until May. Smith blamed her delay in filing an answer on technical difficulties she experienced while attempting to use the electronic document management system (EDMS)—Iowa's online court filing system. On April 3, McCoy filed an application for entry of default judgment, requesting that the district court grant him physical care of E.M.

The district court subsequently entered an order finding Smith to be in default on May 3. This order provided that an evidentiary hearing would be set for May 23 "to determine [Smith's] visitation with the parties' minor child." On May 5,

while he was with Smith to celebrate her other daughter's birthday, McCoy informed her that the district court had entered a default order against her.[5] McCoy recounted this incident in his testimony:

> I think it was on a Saturday or Sunday. I took her to the store to buy presents, and I bought her a few things, and we went back to her cousin's house, which was where the party was taking place and where she was currently residing. I actually asked to speak with all three of them: her cousin, herself and me, and she said her cousin wasn't available, so I just told her that she defaulted, and I would like to have my kid.

However, Smith refused to allow McCoy to leave with E.M. Two days later, she filed for a temporary protective order against McCoy. Smith asserted that she filed for the protective order "[b]ecause there was domestic abuse the night prior when he had initiated sexual intercourse when I had told him no. I do not think he is a bad person or a bad father. It's just that him and I together do not mix well."[6] A temporary protective order was granted to Smith on May 9, and McCoy subsequently entered into a consent agreement for a final protective order. The record shows McCoy violated the protective order several times.

On May 23, the district court held what was supposed to be an evidentiary hearing to determine Smith's visitation schedule. However, it does not appear from the record that the hearing was conducted for its purported purpose because a temporary order granting Smith temporary physical care of E.M. was issued after

---

[5] Both parties agree they had sexual intercourse that day. However, they disagree whether the intercourse was consensual.

[6] Of note, Smith admitted during her testimony that she filed for a protective order against the father of her other daughter shortly after their relationship ended amidst a child custody action.

the hearing.[7] Additionally, the temporary order directed McCoy to pay a temporary child support obligation of $1114.74 per month. The order stated that it would be in effect "until a full evidentiary hearing can be held on the issues of custody and visitation." A custody trial was set for August 1. However, on August 1, the trial was continued due to "unavailability of the court" and rescheduled for September 3.

On September 3, the district court held a custody trial on McCoy's petition. The district court heard testimony from McCoy, McCoy's mother, Smith, and Patricia Hook—McCoy's older sister. Following the hearing, the district court issued its custody decree, granting both parties joint legal custody but placing E.M. in the physical care of Smith.

This appeal followed.

## II. Standard of Review

Our standard of review in child custody cases is de novo. *In re Marriage of Forbes*, 570 N.W.2d 757, 759 (Iowa 1997). "We give weight to the findings of the [district] court, which had an opportunity to view the demeanor of the witnesses when testifying." *Id*. But we are not bound by the district court's findings. *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992).

---

[7] In his brief, McCoy asserts that at the beginning of the hearing, "[t]he Court immediately made it known to the parties that the stated purpose of the hearing, which was simply to receive evidence to determine Jessica's visitation schedule with the parties' child, was no longer how the Court intended to proceed." Additionally, he contends counsel "reminded the Court that [Smith] had previously been found in default and the purpose of the hearing was simply to provide evidence to the Court regarding what [Smith's] visitation schedule should look like." Further, he maintains that his attorney asked for the hearing be reported, but that such request was denied by the district court. Because the May 23 hearing was not reported, we do not comment on the veracity of McCoy's assertions.

## III. Analysis

### A. Default Order

With his first argument on appeal, McCoy contends the district court erred by setting aside the order finding Smith in default *sua sponte*. In support of his argument, he notes that the Iowa Rules of Civil Procedure imply that a motion must be made to set aside a default order. Our rules state, "[o]n motion and for good cause shown . . . the court may set aside a default or the judgment thereon, for mistake, inadvertence, surprise, excusable neglect or unavoidable casualty." Iowa R. Civ. P. 1.977. He highlights that rule 1.977 *does not* provide that the district court may set aside a default order *sua sponte*. Additionally, he notes that Smith never attempted to establish good cause. *See No Boundary, LLC v. Hoosman*, 953 N.W.2d 696, 700 (Iowa 2021) (noting the "movant bears the burden to plead and prove good cause" to set aside a default order or judgment). Thus, because Smith neither filed a motion to set aside the default order nor made a showing of good cause, McCoy claims the district court erred by setting aside such an order *sua sponte*.

The limited record on the default is unfortunate. The order setting hearing was to determine visitation for Smith. We are left with a void as to what occurred at the default hearing. There is no written motion by Smith requesting that the default be set aside. Nor did McCoy seek to make a statement of proceedings under rule 6.806 memorializing what happened off the record.[8] Either would have

---

[8] McCoy's brief asserts that he had requested a reporting of the hearing and that such request was denied.

been of aid on appeal. We leave for another day McCoy's arguments regarding the propriety of setting the default aside.

Iowa law has long favored resolving legal disputes on the merits. *Wharff v. Iowa Methodist Hosp.*, 219 N.W.2d 18, 21 (Iowa 1974) ("The general policy in this jurisdiction has been to allow trial on the merits."); *see also Hobbs v. Martin Marietta Co.*, 131 N.W.2d 772, 775 (Iowa 1964) ("We have . . . emphasized that courts prefer a trial on the merits."). And as our supreme court recently said, "[p]ursuant to this longstanding policy, default [orders] are disfavored." *Hoosman*, 953 N.W.2d at 700. We therefore proceed to the merits of the appeal.

**B. Physical Care**

McCoy argues the district court erred in placing E.M. in the physical care of Smith. His argument on this issue centers around his conviction that he is the more stable parent. By way of stability, he notes that he has lived in the same house for the past four to five years. Additionally, he asserts he is the more suitable physical-care parent because he has a more consistent and stable employment history. Further, he contends the district court minimized Smith's history of mental health struggles. Although Smith testified that she has taken steps to address her mental health in recent months, McCoy highlights that such testimony was not corroborated by any other piece of evidence. We agree with McCoy that he is the parent better equipped to have physical care of E.M. Thus, we conclude the district court erred in granting Smith physical care of the child.

When making physical care determinations, our primary concern is the best interests of the child. *In re Marriage of Weidner*, 338 N.W.2d 351, 355 (Iowa 1983). "The objective of a physical care determination is to place the child[] in the

environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). In determining the best interests of the child, we consider the nonexclusive factors outlined in Iowa Code section 598.41(3) (2024). *Id.* at 696; *see also Moses v. Rosol*, No. 18-0791, 2019 WL 2145709, at *3 (Iowa Ct. App. May 15, 2019). We consider these factors regardless of whether the parents were married or never married. *See* Iowa Code § 600B.40(2) ("In determining the visitation or custody arrangements of a child born out of wedlock . . . section 598.41 shall apply to the determination."). When joint physical care is not appropriate, "the factors of continuity, stability, and approximation are entitled to considerable weight." *Hansen*, 733 N.W.2d at 700.

In placing physical care with Smith, the district court implicitly placed an emphasis on the fact that Smith has served as the child's historical primary caregiver. The district court wrote, "[i]t is undisputed that [Smith] has been the primary caregiver of [E.M.]." The district court also recounted that E.M. has "always resided with [Smith]." Although the court did not elaborate much further on this point, we believe it is clear that it placed a significant amount of weight on this factor. A child's historical primary caregiver is often an important factor to consider in child custody cases. *See In re Marriage of Wilson*, 532 N.W.2d 493, 495 (Iowa Ct. App. 1995) ("The role of primary caretaker is, however, critical in the development of children, and careful consideration is given in custody disputes to allowing children to remain with the parent who has been the primary caregiver."). However, this factor is not dispositive. *See Stanley v. Winters*, No. 22-1552, 2023 WL 2396539, at *2 (Iowa Ct. App. Mar. 8, 2023) ("While we afford weight to the

parent who historically acted as the primary caregiver, this factor is not dispositive.").

For example, the role of the historical primary caregiver is given less weight when it arose due to the actions of one parent arbitrarily keeping the child away from the other. *See Randall v. Trier*, 15 N.W.3d 809, 813 (Iowa Ct. App 2024) ("[W]e hesitate to credit Natalie as H.R.'s primary caregiver when her role resulted partly from denying Cory access to the child."). Here, after E.M.'s birth—and up until the temporary order was entered—Smith largely denied McCoy access to the child. True, she did permit McCoy to have some visits with the child, but they were only allowed to occur in the cab of his truck. And these visits generally only lasted for a few hours. This is no way for a father to develop a meaningful bond with their child. Further, there is evidence in the record suggesting Smith outright denied McCoy visits with the child at times. Moreover, any historical primary caregiving role Smith may have had was relatively short-lived given the young age of the child. Thus, we believe this factor is in equipoise and does not weigh in favor of granting Smith physical care.

Additionally, in granting Smith physical care, the district court concluded that she could better support E.M.'s relationship with the other parent. To justify this conclusion, the district court noted that Smith was "very complimentary of [McCoy's] parenting" during her testimony. In contrast, the district court observed that McCoy "disparaged [Smith] when identifying his concerns about her as a parent."

Child custody cases are often hotly contested. It is merely a small snapshot of the parties' relationship. That McCoy chose not to be as complimentary of Smith

as Smith was to him during his testimony does not mean he is incapable of supporting E.M.'s relationship with Smith. Furthermore, the district court ignored the evidence showing that Smith largely denied McCoy meaningful opportunities of contact with the child before its temporary order was entered. We can hardly think of another action that casts more doubt on one parent's ability to support and foster the child's relationship with the other parent than denying said parent meaningful access to the child. *See Fankhauser v. Kistler*, No. 23-1876, 2024 WL 4615750, at *3 (Iowa Ct. App. Oct. 30, 2024) (noting a parent's denial of another parent's access to a child indicates a lack of respect for the other parent). Thus, we believe this factor is also, at best, neutral. We disagree with the district court that this factor favors Smith.

Moving on to the core of McCoy's argument, we agree that he is the parent who can offer the child greater stability. We reach this conclusion for three reasons. First, throughout this case, McCoy has maintained steady employment. Economic stability is an important factor to consider in determining the best physical arrangement for a child. *See In re Marriage of McDermott*, No. 03-1723, 2004 WL 1853927, at *2 (Iowa Ct. App. July 14, 2004) (noting a child's "physical and financial stability are clearly important considerations"). In contrast, Smith's testimony shows that she has frequently cycled through jobs:

> Before I moved to his—to Travis's residence, I had one job, and I was there for quite some, a little over a year, and then, when I lived there with Travis, he told me that I did not have to work if I did not want to, and then, when I finally did get a job, it was part time, so I was working as a cook in a bar. I became pregnant and heat does not work well with me, and also being pregnant while being a cook is not fun, so I had put in my month's notice, and then, I already had another job lined up for Dollar General, and I was working there up

until the point that I had my mental breakdown and wanting to commit suicide and admitted myself.

Additionally, Smith testified that she got another job after moving to Davenport following her break-up with McCoy. While Smith testified that she is currently employed as a waitress at small diner in Park View, there is no question McCoy is the more economically stable parent.

Second, we note that McCoy has had more stable housing. For the past four to five years, he has lived in the same home. Smith, by her own admission, has moved at least five times during the course of this case. Such housing instability is not conducive to the proper development of a child. To best develop emotionally and physically, a child requires stability. These factors favor placing physical care with McCoy. *See Yarolem v. Ledford*, 529 N.W.2d 297, 298–99 (Iowa Ct. App. 1994) (affirming district court's decision to grant father physical care where he maintained steady employment and lived in the same area, whereas the mother was frequently unemployed, continually moved, and failed to show an ability to be stable).

Third, and most importantly, we have serious concerns with Smith's history of struggles with her mental health. The evidence presented at the custody trial shows that she has struggled with suicidal ideations since at least 2019. Further, Smith herself conceded—in addition to being admitted to a psychiatric ward in 2023—that she has previously been hospitalized for mental health reasons "two other times." We acknowledge that the district court found Smith's testimony

credible on the steps she has taken to address her mental health. And we defer to such determinations for pragmatic reasons.[9] *See Forbes*, 570 N.W.2d at 759.

But the problem with the district court's reasoning is that it disregards Smith's significant and complete history of severe mental health struggles and how that history destabilizes her home environment for placement of primary physical care. The district court's reasoning treats Smith's mental health issues as having *begun* during her relationship with McCoy. And by extension, now that she is no longer in a relationship with McCoy, the district court seemed convinced Smith's mental health issues have dissipated for good. But as mentioned above, the evidence shows Smith has struggled with serious mental health issues since at least 2019, which included threats to commit self-harm while pregnant with the child. To be clear, we do not seek to penalize Smith for her mental-health struggles. But where those struggles indicate a likelihood of instability to the child, we cannot ignore them.

In a text message to McCoy's mother, which was admitted into evidence, Smith admitted she had a plan to kill herself *after* the child was born.[10] Further, McCoy testified that during their relationship, there was a period of time when Smith was not taking her prescribed mental health medication. This testimony was uncontroverted. And even though Smith testified that she has taken steps to address her mental health, there was very little substantive information in her

---

[9] Smith testified that she is taking her prescribed antidepressants and attending therapy regularly. The district court also observed in its order that "[t]here was no evidence submitted showing that [Smith] has been a danger to herself or [the child] since leaving the toxic relationship" with McCoy.

[10] Of note, this would have been *after* the relationship with McCoy ended.

testimony indicating *when* she began to take these steps. Bottom line, unlike the district court, we are not satisfied that Smith's mental health issues have been meaningfully addressed. *See Higdon v. Shafer*, No. 23-0374, 2023 WL 6292337, at *3 (Iowa Ct. App. Sept. 27, 2023) (concluding mother's history of mental health challenges favored placing the child in the father's physical care). Thus, we believe this factor favors placing physical care with McCoy.

The district court was troubled "by [McCoy's] lack of candor and accountability regarding his tendency to follow and track [Smith]." While we too have concerns with such behaviors, we assign them different weight. In weighing that conduct with the objective to place the child in the "environment most likely to bring them to health, both physically and mentally, and to social maturity," *Hansen*, 733 N.W.2d at 695, we are not convinced that Smith's environment is more likely to achieve such goals. Given the record before us, we find the mother's environment to be far less predictable than the father's environment. In short, we are less certain as to what will come next for Smith.

While we generally give weight to the trial court's credibility findings, we are not bound by them and must independently assess whether the evidence supports the trial court's conclusions. *Ruden v. Peach*, 904 N.W.2d 410, 412 (Iowa Ct. App. 2017). This includes credibility findings. *See, e.g.*, *Phillips v. Davis-Spurling*, 541 N.W.2d 846, 850 (Iowa 1995) (crediting a child's allegations of sexual abuse despite the district court's suggestion that the testimony was coached). To do otherwise would defeat the very purpose of appellate review in custody matters. Thus, we are required to "examine the entire record and decide anew the legal and

factual issues" presented for our review. *In re Marriage of Wade*, 780 N.W.2d 563, 565–66 (Iowa Ct. App. 2010).

After careful consideration of the entire record, we disagree with the district court's decision to grant Smith physical care, as we disagree with the conclusions drawn from the sparce record made. The mother's direct examination consisted of two transcript pages. No exhibits were offered by the mother. And the bulk of any stalking or harassment record that was provided was through an unsworn statement the mother made in the midst of her attempted cross examination of the father. And the trial court made no domestic abuse findings. *See* Iowa Code § 598.41(1)(b). The district court's findings of fact consisted of seven paragraphs spanning approximately two pages.

Often child custody cases, including this one, involve two imperfect parents. It makes an already difficult task that more challenging. But we owe a duty to the children of Iowa involved in custody disputes to place them in the "environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695. Here, we find that environment is with McCoy. While we defer to credibility findings, we do not default to them.

## IV. Conclusion

We reverse the district court's grant of physical care to Smith and instead grant McCoy physical care of the child. We remand this matter to the district court to establish a visitation and child support order consistent with this opinion.

**REVERSED AND REMANDED.**

Schumacher, P.J., concurs; Buller, J., dissents.

**BULLER, Judge.** (dissenting).

The maxim that we defer to a district court's credibility findings is often repeated but occasionally not followed. *E.g.*, *McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010). This is one of those cases where, in my view, the majority opinion improperly disregards clear, repeated, and unequivocal credibility findings to instead rely on appellate judges' read of the cold record. Contrary to the majority opinion, I would not substitute my view for that of the trial judge. I would not place physical care of the child with a father who the district court found stalked and harassed the mother, made false reports about her, lied under oath, and would not support her relationship with the child. I also would not flip the trial court's fact-findings on their head to find the mother's mental-health struggles endanger the child when the trial judge found the mother testified credibly that she was stable. I therefore dissent.

Several of the contested factual questions in this matter concerned whether Travis McCoy stalked and harassed Jessica Smith. The district court, after hearing from both parties and other witnesses, wrote it "did not find [McCoy]'s testimony to be credible" and was "troubled by [McCoy's] lack of candor and accountability regarding his tendency to follow and track [Smith]." The credibility findings don't get much more explicit—this is judge-speak for finding McCoy lied or was dishonest in his testimony. The court also impliedly resolved additional credibility questions adverse to McCoy when determining factual questions related to the following incidents:

- McCoy following Smith by vehicle and then later gaslighting Smith by claiming she had no reason to fear for her safety or call police.

- McCoy somehow deducing Smith was at her ex-boyfriend's home and then making an unfounded child-abuse complaint as a result.

- McCoy making so many unfounded complaints the police told him that continuing to do so might be harassment.

Based on these fact-findings, the court placed physical care with Smith, expressly noting "the history of contentious and potentially abusive behavior between the parties, the continued erratic behavior involving government agencies, and the tailing of vehicles after custody exchanges." The facts and the court's ruling tell a consistent story—one in which McCoy is controlling and manipulative, used threats of legal process and stalking in an attempt to dominate Smith, and lied about or minimized those behaviors under oath. Even the majority opinion notes McCoy on multiple occasions violated the court order protecting Smith from contact with him. Unlike the majority, I would not substitute my view of the cold record for that of the district court, which saw these parties first-hand and clearly identified this troubling power-and-abuse dynamic in rendering its custody decision.

Even in light of McCoy's behavior, the court observed Smith "was very complimentary of [McCoy] as a father" and largely blamed their toxic relationship rather than McCoy's character for his conduct. This contrasts starkly with the court's expressed "concerns about [McCoy]'s ability to facilitate the relationship between [Smith] and [the child]" and McCoy's disparagement of Smith's parenting. The district court again made credibility findings here, noting it was "most troubled that [McCoy] attempted to avoid complete honesty in his testimony" regarding Smith's parenting. Again, this is polite judge-speak for finding McCoy lied or dissembled under oath—on more than one occasion. And again, I would not

discount these observations; I do not presume to have more insight into the parties' relationship than the district court did.

Unfortunately, the majority opinion largely drives by the district court's resolution of these fact questions in favor of emphasizing McCoy's positive employment history and housing situation. I do not believe having a good job or owning a house outweighs a history of stalking, harassment, false reports to law enforcement, and dishonesty under oath. And I believe the majority opinion errs in concluding otherwise.

The majority opinion does acknowledge there were contested facts related to Smith's mental health. But it flips the district court's credibility findings on their head to reverse. Below, McCoy essentially argued Smith was unstable, while Smith testified that she was in therapy, under medical management, and has had no mental-health issues since the breakup. The district court found Smith's "testimony about her mental health credible" and even corroborated in part by testimony from McCoy's mother. And the court emphasized that McCoy put forward no evidence that Smith has been a danger to herself or others since ending her relationship with McCoy. The majority opinion identifies these findings but discards them in favor of its own view of the evidence—advantaging its read of the cold record over the district court's consideration of credibility, demeanor, and honesty. I would not do so. There is no record evidence Smith's mental health poses any risk to the child outside the confines of her relationship with McCoy, and I would not reconstitute the record to use Smith's candor about how McCoy affected her mental health against her.

To put my concerns with the majority opinion in broader context, it is worth observing that we frequently implore district judges to be explicit with their credibility findings, so that we can understand when their view of the evidence is shaped by their first-hand perceptions of witness testimony.  The district court here did exactly what we ask, and in my estimation did so clearly and repeatedly.  I am disappointed that the majority believes its view of the cold record is superior to that of the district court, which found one of the parties was dishonest about stalking the other.  I dissent because I would give the district court's credibility findings the deference they are due, recognize the abusive dynamic at the heart of this case, and affirm placement of the child in Smith's physical care.